

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-16-00315-CV

**IN THE INTEREST OF A.G.K.** and T.L.C., Children

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-PA-02489
Honorable Stephani A. Walsh, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:       Rebeca C. Martinez, Justice
               Patricia O. Alvarez, Justice
               Luz Elena D. Chapa, Justice

Delivered and Filed:  November 16, 2016

AFFIRMED IN PART, REVERSED AND RENDERED IN PART

Frances and Thomas[1] appeal the termination of their parental rights. They argue there is insufficient evidence to support the trial court's findings. Because we agree there is legally insufficient evidence to support the trial court's best-interest findings, we reverse the trial court's order terminating Frances's and Thomas's parental rights and render judgment denying the Department of Family and Protective Services' request that their parental rights be terminated. Because the parents do not challenge conservatorship, we affirm that part of the judgment.

---

[1] To protect the identity of the minor children, we refer to the children's parents by their first names and to the children by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8(b)(2).

**PROCEDURAL BACKGROUND**

In October 2014, the Department filed a petition to terminate Frances's parental rights to A.G.K. and T.L.C., to terminate Thomas's parental rights to T.L.C.,[2] and for conservatorship of the children. The Department removed A.G.K. and T.L.C. due to concerns that Frances was over-medicating, over-hospitalizing, under-feeding, and emotionally abusing A.G.K. The Department was unable to determine whether Frances and Thomas neglected or abused the children and ruled out an allegation that Thomas had abused one of the children. The Department returned the children to Frances and Thomas after they completed their family service plans and after Frances's therapist recommended the children be returned home.

The Department removed A.G.K. and T.L.C. a second time because the Department disagreed with Frances's and Thomas's decision to take the advice of a medical doctor and fill the children's prescriptions for psychotropic medication. The case proceeded to a bench trial, at which sixteen witnesses testified. The trial court admitted hundreds of pages of A.G.K.'s medical records, A.G.K.'s school records, and "contact narratives" kept by the Department to document the family's visits. After the parties presented closing argument, the trial court found Frances and Thomas endangered the children and that termination of their parental rights was in the children's best interest. Frances and Thomas now appeal.

**STANDARD OF REVIEW**

A judgment terminating parental rights must be supported by clear and convincing evidence. *Id.* § 161.001(b). To determine whether this heightened burden of proof was met, we employ a heightened standard of review to determine whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25

---

[2] Thomas is A.G.K.'s step-father; A.G.K.'s biological father voluntarily relinquished his parental rights in a prior proceeding.

(Tex. 2002). "This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). We do not reweigh issues of witness credibility but defer to the factfinder's reasonable determinations of credibility. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

A legal sufficiency review requires us to examine the evidence "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* But we may not simply disregard undisputed facts that do not support the finding; to do so would not comport with the heightened burden of proof by clear and convincing evidence. *Id.*

## THE TRIAL COURT'S BEST-INTEREST FINDINGS

The trial court found that termination of Frances's and Thomas's parental rights is in the children's best interest. Frances and Thomas argue the evidence is legally insufficient to support these findings. "To terminate parental rights, the fact-finder must find by clear and convincing evidence that . . . termination is in the best interest of the child." *In re J.P.B.*, 180 S.W.3d at 572. "[T]here is a presumption that fit parents act in the best interests of their children." *In re D.J.H.*, 381 S.W.3d 606, 614 (Tex. App.—San Antonio 2012, no pet.) (quoting *Troxel v. Granville*, 530 U.S. 57 (2000)). The best-interest determination is a wide-ranging inquiry, and the Texas Supreme Court has set out some factors relevant to the determination:

- the desires of the child;
- the emotional and physical needs of the child now and in the future;

- the emotional and physical danger to the child now and in the future;
- the parental abilities of the individuals seeking custody;
- the programs available to assist these individuals to promote the best interest of the child;
- the plans for the child by these individuals or by the agency seeking custody;
- the stability of the home or proposed placement;
- the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and
- any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The list is not exhaustive, and not every factor must be proved to find that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. Evidence of only one factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest—especially when undisputed evidence shows that the parental relationship endangered the child's safety. *Id.*

"Evidence that the parent has committed the acts or omissions prescribed by section 161.001 may also be probative in determining the child's best interest; but the mere fact that an act or omission occurred in the past does not *ipso facto* prove that termination is currently in the child's best interest." *In re O.N.H.*, 401 S.W.3d at 684 (internal citation omitted). Even if there is evidence of poor parenting skills, poor decision making, and inadequate protection of children in the past, the evidence may be legally insufficient to support a best-interest finding when it is undisputed that a parent has done everything the Department has reasonably required of the parent and more. *See In re C.E.K.*, 214 S.W.3d 492, 503 (Tex. App.—Dallas 2006, no pet.).

**A. The Children's Desires**

The Department acknowledges in its brief it did not offer the testimony of A.G.K. or T.L.C. regarding their desires. The Department argues, however, A.G.K. "appeared frightened and distant when Frances and Thomas picked him up from school." There is no evidence that T.L.C. ever

appeared frightened of Frances or Thomas. Bernadette Jimenez, a nurse at A.G.K.'s school, testified:

> I would watch [A.G.K.]'s reaction when mom and dad would pick him up or from the clinic. And he wasn't really receptive to their affection or it just seemed a little -- I was just concerned about him overall, just watch his reaction and it -- he didn't seem comfortable. I don't know how to describe it.

She further testified it appeared to her that A.G.K. was afraid of his parents. School Nurse Bernadette's testimony was based on her observations while A.G.K. attended Sinclair Elementary School from August 2014 to November 2014. A.G.K.'s medical records also note he was "observed to visibly fearful of [Frances]" in April 2014. The Department also received a referral in May 2014 alleging A.G.K. showed fear of being hit by Frances if he did not take a dietary supplement, and a June 2014 referral alleging A.G.K. stated "I don't want to go home with my mom. She is really mean to me and hits me really hard." We must take this evidence as true.

But there is no evidence A.G.K. recently feared his parents. The trial in this case was held in April 2016, nearly two years after these alleged incidents. The Department notes "A.G.K. and T.L.C. bonded well with Frances and Thomas when engaged in therapy." Specifically, notes from Frances's individual and family counselor, Melanie Hennis, state that in June 2015, Frances and A.G.K. interacted well with each other, "they were affectionate toward each other," and A.G.K. "was definitely excited about spending time with his mother."

The Department argues, however, "no evidence suggests they got along well outside of therapy." We disagree. The trial court admitted uncontroverted contact narratives describing the family's visits after the children were removed. They show:

- On August 5, 2015, A.G.K. and T.L.C. "both ran up and hugged [Thomas] when they saw him. [Thomas] picked up [T.L.C.] by the arms and gave him a kiss," and A.G.K. said he was happy to see Thomas.

- On August 6, 2015, A.G.K. went to Frances when he was upset, she hugged him, and he calmed down.

- On October 20, 2015, A.G.K. and T.L.C. "came and hugged their parents and were happy to see them." An October 6, 2015 narrative states Thomas held A.G.K., and A.G.K. was laughing and asked for a cat.

- On October 27, 2015, A.G.K. and T.L.C. were excited to be returned home to Frances and Thomas, they did not want to go back to their foster home, A.G.K. got onto Frances's lap and started hugging her, he gave her a letter that said "I love you," and after he got upset and started crying, Frances was able to calm him down. The contact narrative noted, "Both boys appeared comfortable with their parents and were not fearful."

We may not disregard these undisputed facts, which do not support the trial court's best-interest finding, because doing so would not comport with the heightened burden of proof. *See J.F.C.*, 96 S.W.3d at 266.

**B. The Children's Needs, Acts and Omissions & Explanations**

The Department argues evidence of the following acts and omissions supports the trial court's best-interest findings: (1) Frances's drug use in 2009; (2) falsification of A.G.K.'s behavioral conditions; (3) over-medication of A.G.K.; (4) over-hospitalization of A.G.K.; (5) A.G.K.'s emaciation and failure to thrive; (6) emotional abuse of A.G.K. in 2014 (when he was five years old) by having him wear leg braces, sending him to school in a Pull-up diaper, making him drink from a sippy cup, sitting him in a high chair when he ate, and requiring him to be isolated when he ate; (7) physical abuse of A.G.K. and failure to seek medical treatment; (8) frequent switching of schools; and (9) A.G.K.'s and T.L.C.'s improvements in foster care.

*1. Drug Use*

The Department argues, "Frances endangered A.G.K. from the very beginning of his life when he was born with drugs in his system." Although there is evidence A.G.K. was born drug-addicted, it is undisputed Frances stopped using drugs after A.G.K. was removed in 2009 and has

remained drug free since then. It is also undisputed Frances completed her family service plan after A.G.K.'s 2009 removal and the Department decided to place A.G.K. back with Frances in 2010. Distant acts such as drug use, absent evidence that similar conduct remains a current or future threat to the children, may not support termination. *See Wetzel v. Wetzel*, 715 S.W.2d 387, 390 (Tex. App.—Dallas 1986, no writ). The Department presented no evidence that Thomas ever used drugs or that Frances's use of drugs in 2009 endangered T.L.C. Because it is undisputed Frances has rehabilitated herself and remained drug free since 2009, and there is no evidence that drug use remains a current or future threat to the children, Frances's drug use in 2009 does not support termination. *See id.*

### 2. Pediatric Condition Falsification

The Department argues Frances falsified A.G.K.'s behavioral conditions. The Department primarily relies upon the testimony of Dr. James Lukefahr, Nurse Kathleen Buckley, and School Nurse Bernadette. Dr. Lukefahr personally examined A.G.K. after he was removed from Frances and Thomas in 2014. Dr. Lukefahr was concerned that Frances might suffer from Pediatric Condition Falsification disorder (formerly known as Munchausen's syndrome by proxy) based on reports Department caseworker Buckley had provided him and the number of medications A.G.K. had been prescribed by other medical professionals. Dr. Lukefahr testified he had not reviewed all of A.G.K.'s school records or his medical records and he testified it is sometimes acceptable to have a child A.G.K.'s age on psychotropic medication. He clarified his testimony and stated he had not diagnosed Frances with Pediatric Condition Falsification disorder or Munchausen's syndrome by proxy.

Before A.G.K. was removed in 2014, Frances agreed to take A.G.K. to the Center for Miracles, where A.G.K. met with Nurse Kathleen. Nurse Kathleen testified she had a similar concern that Frances falsified psychiatric conditions because such diagnoses "require problems in

two domains." However, she also testified the Department did not provide her with all of A.G.K.'s medical records from his admissions to psychiatric hospitals. The trial court admitted those records, which detail A.G.K.'s behavioral problems after he was admitted. The Department did not offer evidence contradicting these medical records.

Finally, School Nurse Bernadette expressed a concern that A.G.K. was not showing aggressive behavior at school, as Frances had reported. However, School Nurse Bernadette testified a teacher reported to her that A.G.K. was injured because he could not sit still in class, and he fell over and hit his ear or head on the table. Caseworker Buckley testified Frances once took A.G.K. for in-patient psychiatric care in 2014 and removed him because she disagreed with the facility's assessment that A.G.K. was not exhibiting behavioral problems.

We must take this evidence as true, but we may not ignore undisputed facts that do not support the trial court's findings because doing so does not comport with the heightened burden of proof by clear and convincing evidence. *See In re J.F.C.*, 96 S.W.3d at 266. Frances testified she and A.G.K.'s first foster mother observed A.G.K. was easily upset, had mood swings, could not sustain attention, and had episodes of aggression. Other undisputed evidence shows that, in addition to A.G.K.'s teacher who observed him injure himself because he could not sit still, several others personally observed A.G.K. exhibit similar behavior.

Thomas Gaines, Ph.D., a licensed specialist in school psychology, conducted a psychological evaluation of A.G.K. in June 2014. Dr. Gaines personally observed A.G.K.'s conduct. His report stated his observations were consistent with what Frances had reported to him and explained:

> Behaviorally, [A.G.K.] appears to be highly restless, distractible and impulsive. He has difficulty listening to what others tell him as well as focusing on one idea or task for an extended period of time. He is easily distracted by irrelevant thoughts and extraneous noises and conversations. He often overlooks and fails to respond appropriately to directions and other important cues in his environment. [A.G.K.]

is impatient and has difficulty waiting for what he wants. He is likely to find it hard to organize and finish tasks, to lose or forget important things, and to make careless mistakes. Even when he tries to please others (e.g., authority figures), he is apt to have difficulty maintaining his concentration and compliance with rules and expectations.

Dr. Gaines further noted A.G.K. appeared to be moody and irritable and "to experience moderate emotional distress. He portrays projective characters as being mean, scaring others, fighting, and feeling mad, bored and/or upset." He also noted A.G.K. exhibited an "odd gait" and is likely to "lie excessively."

Robert Jimenez, M.D. personally observed A.G.K. at a psychiatric hospital two times in 2014. He interviewed A.G.K. and noted A.G.K. was depressed, anxious, irritable, and having audio and command hallucinations. Nurses on Dr. Jimenez's team observed A.G.K. as:

> [V]ery er[r]atic and unpredictable. Without provocation he will become explosive and escalate to the point of complete loss of control. [H]e bangs his head violently and repeatedly on the wall and the floor. [He] has an inordi[na]te appetite and is very irritable. He states that he has heard voices that tell him do 'very bad things'. He talks to an imaginary friend.

A.G.K.'s medical records from the visit also state A.G.K. had paranoid delusions, threw tantrums, and occasionally refused to eat. The records also state Frances and Thomas initially did not want A.G.K. on medication, but "they finally realized he would not stabilize without an antipsychotic and consented."

Counselor Darlene Jimenez counseled A.G.K. in 2014 before he was removed. For all of A.G.K.'s visits except for one, Counsel Jimenez's records note A.G.K. exhibited aggressive behavior toward himself or other people.

Furthermore, the Department sought the opinion of Gary Bobele, M.D., for a "fresh set of eyes" after A.G.K. was removed. In December 2014, Dr. Bobele observed A.G.K. was "a little hyperactive" like most children, but after receiving questionnaires filled out by A.G.K.'s teachers stating A.G.K. had problems with his attention, social skills, and hyperactivity, Dr. Bobele

determined "attention deficit disorder was probably the right diagnosis to start with." Dr. Bobele recommended A.G.K. be placed on medication and discussed different medication with the Department caseworker Buckley.

The Department sought another opinion from Carmen Salmeron, Ph.D., who conducted a comprehensive psychological evaluation of A.G.K. in June 2015. Although Dr. Salmeron ruled out several of A.G.K.'s prior diagnoses, she did not rule out ADD or ADHD. Dr. Salmeron diagnosed A.G.K. with "Posttraumatic Stress Disorder with Depression." According to Dr. Salmeron, manifestations of A.G.K.'s diagnosis "can range from aggression to anxiety to . . . relatively adaptive behavior. It comes and goes. There's depression sometimes involved."

The children's foster mothers Christine Graham and Kelley Cole testified at trial. Foster mother Graham testified A.G.K. "refused to get out of the car for about 15 minutes. He was relatively nonverbal with the caseworker, and cried a bit. He stated that he was afraid but would not say why. Eventually he agreed to go inside when the caseworker offered to carry him." Graham has been a licensed foster parent for approximately ten years and had fostered over one-hundred sixty children. According Graham, A.G.K. was a:

> [v]ery active little boy. He would get mad at simple things, simple tasks, cry when asked to do something really simple. We do homework together and he would start off paying attention. Maybe three or four minutes into it, he would constantly look off into another direction. I had to kind of seclude him because he would always constantly look at everybody else and not pay attention to what was going on with his homework.

She observed him have "anger issues" at times. "He would throw things or he would just get upset where he would hit objects or the table or a chair." Although Graham thought some of A.G.K.'s behaviors were normal for a child, she determined his overall behavior justified a doctor's visit.

Foster mother Cole testified most of A.G.K.'s and T.L.C.'s behavior was typical and normal for brothers, but "[t]hey do tend to get a little aggressive with each other" and both "have

trouble sitting still" and "paying attention." Cole explained A.G.K. would choose not to eat as part of a "power struggle," but when he was given different options, he was not a picky eater. According to Cole, A.G.K. was angry; he and T.L.C. would be angry at each other "a lot"; they would push each other; and T.L.C. would push other children. Cole testified the pushing was not extraordinary. Cole found that A.G.K. responded better to a strict schedule and she did not think A.G.K. needed to be on ADHD medications. Cole did not observe the children act afraid of Frances or Thomas.

Dr. Lukefahr affirmatively stated he was not testifying Frances suffered from Pediatric Condition Falsification disorder (or Munchausen's Syndrome by Proxy). He and Nurse Kathleen testified their concerns about the possibility of Frances having such a disorder were based on the absence of evidence that others observed A.G.K. as being hyperactive or aggressive. Witnesses testified without contradiction and the undisputed evidence contained in A.G.K.'s medical records show that A.G.K. was diagnosed with ADHD; his hyperactivity was observed by numerous individuals other than Frances; and A.G.K. had undisputed episodes of agitation, aggression, mood swings, and auditory-command hallucinations. Thus, Dr. Lukefahr's and Nurse Kathleen's testimony does not support the Department's assertion that Frances suffered from Pediatric Condition Falsification disorder.

### 3. Overmedication

The primary dispute at trial and between the Department and the parents was whether Frances overmedicated A.G.K. The Department argues Frances "administered over seven different types of psychotropic medications at one time, compromising [A.G.K.'s] health and development." It was undisputed at trial that A.G.K.'s medications were prescribed by doctors because of A.G.K.'s behavior, which was observed by several individuals over the course of several years in several different settings. The only evidence pertaining to the potentially harmful side effects of A.G.K.'s medications was that Ritalin can suppress one's appetite and Risperdal

caused A.G.K. to have "tics" or "tremors." However, it was undisputed that doctors prescribed A.G.K. at least three other medications that would stimulate his appetite. Furthermore, according to A.G.K.'s medical records, Dr. Jimenez decided to keep A.G.K. on Risperdal because the benefits of Risperdal "far outweigh" the side effects of tics and tremors, which side effects could be addressed with Benadryl.

Dr. Jimenez testified without contradiction that ADHD is "a neurological problem." Dr. Bobele testified without contradiction that "medication has been shown to be the most effective therapy for [ADHD]." Dr. Bobele explained there was a recent "big study" comparing different approaches to therapy for ADHD and the study "found that medication therapy was superior to other kinds of approaches to treatment." The record does not support the Department's suggestion that the side effects of A.G.K.'s medications outweighed the benefits. Finally, with regard to T.L.C., the Department presented no evidence that Frances and Thomas's decision to give A.G.K. prescribed medication affected T.L.C. negatively in any way.

*4. Over-Hospitalization*

The Department argues Frances took A.G.K. to the hospital too many times, disrupting his growth and development. Specifically, the Department notes "A.G.K. was hospitalized by Frances at least five times in eleven months before the Department removed him." At trial, Department caseworker Buckley and Dr. Lukefahr testified that unnecessarily taking a child to a hospital can be disruptive to a child. However, there is evidence that only one of A.G.K.'s hospitalizations was unnecessary. Department caseworker Buckley testified Frances took A.G.K. to a medical facility during the 2013-2014 school year for in-patient treatment, was informed by a facility representative that no behavioral problems were observed, and then removed A.G.K. from the facility because she disagreed with the assessment.

But it was undisputed that Frances took A.G.K. for in-patient treatment when A.G.K. was "hearing voices" and violently and repeatedly banging his head on the wall and the floor, behavior that was independently observed by medical professionals at a different in-patient facility. Another time when Frances took A.G.K. to a psychiatric hospital, medical professionals observed A.G.K. have "agitation, tremors, restless leg kind of phenomenon, and ticks," which were also observed by medical professionals at the hospital. Another hospital visit was for an x-ray of A.G.K.'s nose after he had fallen down the stairs. And, as the Department acknowledges, it is undisputed that Frances took A.G.K. to the hospital and reported his weight issues—which was one of the Department's primary concerns—and that A.G.K. gained weight while he was in the hospital. We may not disregard these undisputed facts when determining whether the Department satisfied its heightened burden of proof in this case. *See id.* Finally, there is no evidence that A.G.K.'s hospital visits affected T.L.C.

*5. Emaciation & Failure to Thrive*

The Department argues Frances and Thomas caused A.G.K. to fail to thrive and become emaciated by intentionally withholding food as a form of punishment and restricting his diet. It is undisputed that A.G.K. has always been in the fifth percentile of body weight or lower, he did not weigh above the fifth percentile when he was reunited with Frances in 2010, and he was diagnosed as failure to thrive at his twelve-month check-up when A.G.K. was first placed in foster care. Because it is undisputed that A.G.K. has always had a very low body weight, there is no evidence supporting the Department's suggestion that Frances and Thomas caused him to become emaciated after the Department returned A.G.K. to Frances. The Department acknowledges Frances and Thomas took A.G.K. to the hospital out of concern for his low weight and, as a result of seeking medical attention, A.G.K. gained weight. It was further undisputed that Frances and Thomas gave A.G.K. three different prescribed medications that had the side effect of stimulating his appetite.

School Nurse Bernadette testified she inferred Frances must have been withholding food as a form of punishment from the sole fact that A.G.K. "was always hungry."[3] When explaining what she meant by "restricting" A.G.K.'s diet, School Nurse Bernadette clarified she was concerned about the type of food Frances provided for A.G.K. She testified:

> [Frances] would do a menu and she wanted to know exactly how much he ate. And there would be like six olive[s], six pickles, just things that you wouldn't normally see in a child's lunch. You know, it would be like one Nutella sandwich, and then there were other kinds of items he wasn't interested in eating, but they were on the menu and she wanted written down exactly what he ate and didn't eat.

The trial court admitted into evidence two lunch menus Frances had prepared for A.G.K. Both lunch menus included a monthly calendar with entries for school days. One of the menus shows one week of entries: each day, A.G.K. was to eat (1) a sandwich (Nutella and banana, ham and cheese, or chicken and cheese); (2) fruit (either grapes or strawberries); (3) either yogurt or pudding; (4) pickles or olives; and (5) Ensure.[4] The other menu contained entries with a wider variety of food including various types of sandwiches, chicken nuggets, mashed potatoes, cheese and pepperoni pizza, sweet potato fries, taco salad, hamburgers, chicken fajitas, and various fruits and vegetables.

Three of A.G.K.'s foster mothers, as well as Frances, described him as a "picky eater." A.G.K.'s foster mother Cole testified A.G.K. used food as a form of power and control, and she was able to get him to eat when she gave him options. A.G.K. was on three medications that would stimulate his appetite. Once Frances and Thomas learned they could successfully encourage A.G.K. to eat by giving him choices, they successfully implemented that technique during visits

---

[3] Department caseworker Buckley and Dr. Lukefahr also testified about this concern, but both referred to the source of the concern was A.G.K.'s school records.

[4] Dr. Lukefahr and School Nurse Bernadette testified Ensure was not appropriate for a child because it is "for adults" and not "for children." It was undisputed Frances had A.G.K. drink Ensure as a dietary supplement to increase A.G.K.'s calorie intake and protein at Dr. Jimenez's recommendation. Other than testimony that Ensure is "for adults," there is no evidence Ensure is harmful if consumed by a child. Frances and Thomas explained they gave A.G.K. Ensure because he refused to drink Pediasure and Dr. Jimenez also had A.G.K. drinking Ensure.

and at home after the children were returned. We may not disregard these undisputed facts when determining whether the Department satisfied its heightened burden of proof in this case. *See id.* Considering the record as a whole and considering the Department's evidence in light of other undisputed facts, the record does not support the Department's assertion that Frances or Thomas caused A.G.K. to become emaciated by intentionally withholding food from him as a form of punishment.

### *6. Emotional Abuse & the Department's Scapegoating Theory*

Although the Department acknowledges there is "no evidence suggest[ing] T.L.C. was the victim of . . . emotional abuse," it argues there is evidence that Frances and Thomas emotionally abused A.G.K. by making him wear leg braces and wear a Pull-up diaper to school, forcing him to drink from a sippy cup, sitting him in a high chair when he ate at home, and requiring him to be isolated when he ate at school. The Department suggests Frances and Thomas intended to abuse A.G.K. emotionally because the family had "problems" they sought to blame on A.G.K.'s behavior. The Department also notes it "became concerned for T.L.C. as A.G.K.'s removal would endanger T.L.C., as he could become the new scapegoat." The Department argues that T.L.C. "adopted" his parents' behavior and blamed A.G.K. for their being in foster care.

Dr. Lukefahr testified, "Scapegoating is where one family member, frequently a child, is blamed for the problems that the family is having, be they emotional, financial, or otherwise, and that child is singled out for negative treatments." He further testified "[t]here is a phenomenon where if the scapegoat is removed from the situation, then another individual . . . then becomes the new scapegoat." Dr. Lukefahr testified he did not "interview the parents or teachers or anybody else to determine if scapegoating could be diagnosed." Department caseworker Buckley testified she believed Frances was "scapegoating" A.G.K. by "[m]aking false reports about his behaviors to get him hospitalized [and] placed on medications." Department caseworker Buckley echoed Dr.

Lukefahr's concerns about scapegoating in her testimony. Foster mother Cole testified that when A.G.K. and T.L.C. first came to live with her, she heard T.L.C. blame A.G.K. for their being in foster care.

The Department does not identify in its brief any "problem" for which Frances and Thomas used A.G.K. as a scapegoat. The only evidence of such "problems" was Nurse Kathleen's testimony. Nurse Kathleen testified she reviewed records the Department provided her and identified several risk factors: Frances had a history of mental illness, the family lived in poverty, and A.G.K. was "living with an unrelated adult." However, Nurse Kathleen clarified on cross-examination that the Department failed to inform her that the "unrelated adult" was Frances's husband, T.L.C.'s biological father, and A.G.K.'s step-father. She also testified she did not know Thomas had a job as a nurse, and she inferred the family was living in poverty because Frances might have qualified for Medicaid. Furthermore, it was undisputed Frances had not used drugs since 2009, and she managed her anxiety and ADHD with medication and Thomas's support.

There is evidence that in November 2014, when A.G.K. was five, he was wearing leg braces and Pull-up diapers, drinking from a "sippy cup," and eating in a highchair at home. But it was undisputed at trial that an orthopedic specialist recommended that A.G.K. wear leg braces. A June 2014 physical therapy record shows A.G.K.'s motor skills were fairly normal but he "presented with impaired strength, balance, coordination, [and] motor planning . . . [and he] would benefit from skilled physical therapy services 2x/week to improve impairments in order to acquire age appropriate gross motor skills." His subsequent physical therapy notes showed A.G.K. reached 75%-80% of his short term goal of ascending stairs without support and he reached 50%-65% of descending steps without support. His records also state he had "poor ankle stability" when walking on an eight-foot line.

Department caseworker Buckley testified A.G.K. "had accidents at the very beginning," but she believed Pull-up diapers were inappropriate because it appeared to be emotional abuse. A.G.K.'s medical records show that foster mother Cole and nurses at a psychiatric facility observed A.G.K. use food and bathroom accidents to gain power and control over his environment. When A.G.K. was admitted for in-patient care, he would refuse to go to his room and would "sit in the hallway until he urinate[d] on himself."

Frances explained she had A.G.K. eat in a highchair "because he would make a big mess when he would eat," and Thomas explained A.G.K. drank from a "sippy cup" because "he spilled stuff." Frances's and Thomas's explanation that A.G.K. spilled and made messes when he ate and drank was not contradicted. Instead, it is undisputed that A.G.K. suffered from ADHD and often could not sit still, and one of the Department's contact narratives notes A.G.K. "was spilling his ice cream on himself."

Department caseworker Buckley testified Frances "had allegedly asked the school to have the child eat alone in the cafeteria or in the office at the school." School Nurse Bernadette testified she had documentation from A.G.K.'s doctor suggesting eating in the cafeteria "was too stimulating" for A.G.K. According to School Nurse Bernadette, she "questioned the doctor's office" and contacted Nurse Darlene. School Nurse Bernadette testified Nurse Darlene told her it "was fine" for A.G.K. to eat in the cafeteria "if [A.G.K.] was okay and it wasn't over stimulating."

The record does not support the Department's arguments that Frances and Thomas emotionally abused A.G.K. by treating him as a scapegoat for the family's problems, making him wear leg braces and a diaper to school, having him drink from a "sippy cup," having him sit in a high chair when he ate at home, and requiring him to be isolated when he ate at school. It was undisputed that either a doctor or nurse recommended Frances's and Thomas's actions, or Frances and Thomas were attempting to address A.G.K.'s messy eating and bathroom accidents. We may

- 17 -

not disregard these undisputed facts when determining whether the Department satisfied its heightened burden of proof in this case. *See J.F.C.*, 96 S.W.3d at 266.

*7. Physical Abuse & Failure to Seek Medical Care*

Although the Department acknowledges there is "no evidence suggest[ing] T.L.C. was the victim of physical . . . abuse," it argues Frances and Thomas physically abused A.G.K. The Department received an allegation that A.G.K. said he did not want to leave in-patient treatment in June 2014 because Frances "is really mean to me and hits me very hard," and Frances yanked A.G.K.'s arm and spanked him twice. School Nurse Bernadette testified A.G.K. came to school one day in October 2014 with red marks on his cheek and he told her Thomas "got mad" at him and hit him across the face. She then clarified her testimony, after locating her notes at trial, that on October 31, 2014, A.G.K. came in late and had "two marks on both sides of face." She testified A.G.K. told her Thomas had "kicked him and pushed him down the stairs and that [Thomas] was being mean to him."

There is evidence that on a separate occasion in August 31, 2014, A.G.K. fell down the stairs, causing him to bruise his nose and fracture his wrists. The Department argues there is evidence that Thomas caused A.G.K.'s bone fractures by kicking A.G.K. and pushing him down the stairs on that date. We disagree. When School Nurse Bernadette clarified her testimony based on her October 31, 2014 notes, she stated A.G.K. said he received two red marks on his face that day because Thomas "kicked him and pushed him down the stairs and that [Thomas] was being mean to him." This incident was two months after A.G.K. fell down the stairs. Furthermore, Dr. Lukefahr testified he asked A.G.K. to explain who hurt his arms or wrists and A.G.K. first said no one had hurt him, but then said T.L.C. had hurt him. Dr. Lukefahr testified that A.G.K.'s wrist fractures were consistent with falling, but had concerns that A.G.K.'s metacarpal bone fracture was from something smashing or stomping on his hand.

Although the Department investigated several referrals alleging physical abuse prior to December 2014, the Department was unable to determine whether physical abuse occurred because there was—in the Department's determination—insufficient evidence. In addition to A.G.K.'s conflicting accounts of how he was injured, it was undisputed that A.G.K. had episodes of hyperactivity, one of which caused him to fall out of his chair and injure himself; physical fights with T.L.C. and other children; and difficulty ascending and descending stairs without support. Dr. Gaines's psychological evaluation of A.G.K. also noted A.G.K. would "lie excessively."

The Department argues there is evidence that Frances and Thomas failed to seek medical treatment for A.G.K.'s bone fractures after he fell down the stairs. We disagree. It is undisputed that Frances and Thomas took A.G.K. to the emergency room after he fell down the stairs because of a bump on his nose. Department caseworker Buckley testified she reviewed the records from A.G.K.'s visit to the emergency room and, according to Buckley, the physician and nurse did not "note any kind of extremity pain." There also is no evidence A.G.K. had ever complained of pain in his hands, wrists, or arms after August 31, 2014, when he fell down the stairs. The witnesses who testified about their interactions with A.G.K. during this time affirmatively testified A.G.K. did not complain about pain in his wrists.

There is some evidence that Frances and Thomas had hit A.G.K. in 2014 before the children were removed. However, it is undisputed that after the children were removed in 2014, Frances and Thomas completed their family service plans and successfully used parenting techniques they had learned in therapy. Counselor Hennis testified she recommended with 100% certainty that the children should be returned to their parents. It is undisputed that after the Department returned the children to Frances and Thomas, A.G.K. and T.L.C. reported there was no physical abuse. Furthermore, the sole reason the Department removed the children again in 2015 was caseworker Buckley's disagreement with the parents' decision to follow the medical advice of another medical

professional who, after the children were returned to Frances and Thomas, recommended and prescribed medication for the children. Thus, there is no evidence that physical abuse remains a current or future threat to the children. *See Wetzel*, 715 S.W.2d at 390.

*8. Frequent Switching of Schools*

The Department argues Frances and Thomas failed to provide for A.G.K.'s physical and emotional needs by "switch[ing] schools multiple times over the course of a year and a half, disrupting his growth and development." There is evidence that A.G.K. was attending pre-school at Premiere Leadership Academy, and at the beginning of the new school year, A.G.K. started kindergarten at Sinclair Elementary School. However, the Department's evidence shows A.G.K. and T.L.C. switched schools multiple times because of the Department's removals and the changes in foster parents.

*9. Foster Care*

The Department contends "A.G.K.'s and T.L.C.'s physical and emotional needs were met with their foster parents, where their health improved." There is some evidence that the children's health improved. Foster mother Cole described A.G.K. and T.L.C. as normal brothers, but she testified A.G.K. and T.L.C. were aggressive and often angry with each other and had trouble sitting still and paying attention. Foster mother Graham also testified about A.G.K.'s episode of "refusing to get out of the car for about 15 minutes," crying, and saying he was afraid for no apparent reason. Graham also described A.G.K. as "very active," and testified he had anger issues, was easily distractible, would cry when asked to do something "really simple," and would hit objects, the table, or a chair. Graham believed A.G.K. would benefit from medication, as did the doctor Graham took A.G.K. to see.

There is undisputed evidence that after the Department removed A.G.K. and T.L.C. in November 2015, A.G.K. and T.L.C. continued fighting; T.L.C. would bite and be "very defiant";

A.G.K. angered easily, would cry a lot, and would "kick things" when he did not want to do something; homework time was a "nightmare"; and A.G.K. was distractible and required disability accommodations at school. Although there is evidence that A.G.K.'s and T.L.C.'s health, behavior, and school performance improved as they got older, the evidence does not support the Department's suggestion that A.G.K.'s and T.L.C.'s behavioral issues improved in foster care.

## C. Parenting Abilities & Services

The Department argues that "[o]nce reunited, Frances was unable to successfully parent A.G.K., relying on psychotropic medications." The Department contends Frances and Thomas gave A.G.K. psychotropic medication without the Department's consent after the Department returned A.G.K. and T.L.C. in November 2015. There is conflicting testimony as to whether the Department instructed Frances and Thomas not to give A.G.K. or T.L.C. medication without the Department's approval. There is also conflicting testimony that Frances and Thomas subjectively wanted A.G.K. and T.L.C. on medication and that they fabricated a bus driver's threat to prevent A.G.K. and T.L.C. from riding the school bus if they continued to misbehave. The trial court was entitled to resolve these disputes in the Department's favor and believe that France and Thomas were attempting to find a way to get A.G.K. back on medication. *See In re J.F.C.*, 96 S.W.3d at 266.

But we may not disregard undisputed facts in determining whether the Department met its heightened burden of proof in this case. *See id.* Frances and Thomas's decision to fill A.G.K.'s and T.L.C.'s prescriptions is reasonably explained by the undisputed evidence at trial. A.G.K. had a history of hyperactivity and aggression. Several medical professionals recommended medication for A.G.K., and Dr. Bobele testified without contradiction that medication is the most effective method to treat ADHD. Frances was required by her family service plan to continuing taking her medication, and she found that taking medication personally helped her manage her anxiety and

ADHD. Thomas had approximately thirty years of experience as a nurse, worked at a psychiatric hospital, and personally observed the benefits of psychotropic medications. Frances's and Thomas's act of filling A.G.K.'s and T.L.C.'s medication without the Department's consent is explained by Frances's and Thomas's personal experience with the benefits of psychotropic medications and doctors determining psychotropic medications would benefit the children.

After the Department returned A.G.K. and T.L.C. to Frances and Thomas, A.G.K. hit T.L.C. on the side of the head with a toy and T.L.C.'s school would not allow him to return without a doctor's note. Frances took A.G.K. and T.L.C. to see Dr. Pick, who placed T.L.C. on Citirazine, an anti-allergy medication, and prescribed Intuniv, a mood stabilizer, for A.G.K. and T.L.C. Although there is evidence that Frances and Thomas filled the medication and T.L.C. was given anti-allergy medication, there is no evidence that Intuniv, if given to A.G.K. or T.L.C., would have had any harmful side effects. Department caseworker Buckley informed Frances and Thomas she was "not completely opposed to meds for ADHD for [A.G.K.]."

The Department acknowledges "Frances and Thomas successfully completed services recommended by the Department." It also acknowledges "Frances and Thomas performed well after reunification implementing therapy techniques to address A.G.K. and T.L.C.'s behavior during therapy sessions." According to the undisputed evidence, Frances was successfully implementing techniques she had learned in family therapy and the Department's records describe her parenting skills as "very textbook."

Counselor Hennis initially predicted in spring 2015 that it would take at least a full year for Frances to make "even the slightest progress" and she could not "see the children ever going back to [Frances]." According to Hennis, Frances and Thomas "did a good job over the course," and "could definitely implement" strategies and techniques she suggested. And, as of October 2015, Hennis recommended with 100% confidence the children be returned home. The

- 22 -

Department's contact narratives detailing the family visits confirmed Frances was able to calm A.G.K. down when he got upset; successfully encouraged A.G.K. and T.L.C. to eat without complaining; and helped A.G.K. complete his homework. The record does not support the Department's assertion that Frances and Thomas "chose to cease [these parenting techniques] at home" and instead relied solely on medication after the children were returned in 2015.

**D. Plans for the Children & Stability of the Home**

The Department plans for the children to be adopted. Department caseworker Buckley testified there were three families who expressed interest in adopting A.G.K. and T.L.C.: (1) foster mother Graham; (2) a family that has adopted other children before but is "not licensed"; and (3) a foster family in El Paso that A.G.K. and T.L.C. had not met. Other than Graham, there is no evidence as to the parenting abilities or homes of the other families that expressed interest in adopting A.G.K. and T.L.C. Graham testified she wanted to adopt the children because she believed it was a way that A.G.K. and T.L.C. could be reunified with Frances and Thomas. She testified:

> My personal opinion is that I feel that the children should be placed with their biological mom and dad, that -- I feel that they are wonderful parents who deserve to have their children back and they are very nurturing and caring and we would love to have [A.G.K.] and [T.L.C.] if they didn't go back home to their family. But I feel like that they are fully capable of doing this, taking care of them."

Regarding Frances's and Thomas's home, the Department's contact narratives described their home as having plenty of food, and the home was safe and appropriate for A.G.K. and T.L.C.

**E. Conclusion**

The record does not support many of the Department's arguments and characterizations of the evidence. The Department primarily relies on Frances's and Thomas's conduct predating the children's removal in November 2014. Frances's drug use in 2009, which caused A.G.K. to be born prematurely and drug addicted, is concerning. But because it is undisputed she has remained

drug free and there is no evidence suggesting Frances is likely to start using drugs in the future, Frances's drug use in 2009 is too remote to support the trial court's best-interest finding. *See Wetzel*, 715 S.W.2d at 390.

There is evidence that before November 2014, Frances hit A.G.K. across his face causing him to be afraid of her and Thomas hit A.G.K. on one occasion leaving red marks on A.G.K.'s face and possibly kicked A.G.K. and pushed him down the stairs. But it is undisputed that after A.G.K. and T.L.C. were removed in November 2014 and someone fractured his wrist, Frances and Thomas learned and successfully implemented parenting skills from their family service plans that were effective. Although A.G.K. said Thomas kicked him and pushed him down the stairs, A.G.K. gave conflicting accounts of whether it was his parents, his brother, or no one who had hurt him, and based on Dr. Gaines's evaluation, A.G.K. was likely to "lie excessively" and describe authority figures as "mean." There is also no evidence Frances and Thomas hurt A.G.K. after November 2014, and there is undisputed evidence showing neither A.G.K. nor T.L.C. has shown any fear of Frances or Thomas dating back to August 2015. We may not disregard these undisputed facts when determining whether the Department satisfied its heightened burden of proof in this case. *See J.F.C.*, 96 S.W.3d at 266.

There is evidence suggesting Frances once took A.G.K. to a facility for in-patient treatment when he was not exhibiting any behavioral problems. The Department suggests it is reasonable to infer from one unnecessary hospitalization that all of A.G.K.'s hospitalizations were unnecessary. We disagree. Undisputed evidence shows there was a basis, if not medically necessary reasons, for A.G.K.'s numerous other hospital visits. We may not disregard these undisputed facts when determining whether the Department satisfied its heightened burden of proof in this case. *See id.*

In addition to there being no evidence that the children desired Frances's and Thomas's parental rights to be terminated, other undisputed facts show that many of the *Holley* factors weigh

against a finding that termination is in the children's best interest. Frances and Thomas repeatedly sought to determine and meet the emotional and physical needs of both A.G.K. and T.L.C. They completed their family service plans and successfully implemented parenting skills they learned in counseling. Frances not only completed her family service plan, but sought additional therapy. Frances was able to manage her anxiety and ADHD with medication and her relationship with Thomas, and Frances and Thomas had a safe home for A.G.K. and T.L.C.

Most of the Department's evidence demonstrated the Department questioned or disagreed with how Frances and Thomas addressed A.G.K.'s and T.L.C.'s physical and mental needs. But, considering the undisputed evidence, Frances and Thomas had legitimate explanations for (1) the number of medications A.G.K. had been prescribed; (2) relying on combination of medication and other techniques to manage A.G.K.'s and T.L.C.'s behavior; and (3) having A.G.K. wear leg braces and Pull-up diapers, sit in a highchair when eating, drink from a "sippy cup" and eat alone at school. In light of the undisputed facts in this case, we hold a factfinder could not reasonably form a firm belief or conviction that termination of Frances's and Thomas's parental rights is in the children's best interest. *See In re C.H.*, 89 S.W.3d at 25.

## DISPOSITION

The Department requests we reverse and remand in the interest of justice because Frances and Thomas did not contest the trial court's award of conservatorship to the Department, and the children would be left in "custody limbo" if we rendered judgment denying its request to terminate Frances's and Thomas's parental rights. When we conclude there is legally insufficient evidence, we must ordinarily reverse and render judgment. *Flores v. Brimex Ltd. P'ship*, 5 S.W.3d 816, 821 (Tex. App.—San Antonio 1999, no pet.). Under unique circumstances when the trial record is not fully developed, we may exercise our broad discretion to remand for a new trial in the interest of justice. *In re J.A.J.*, No. 04-14-00684-CV, 2014 WL 7444340, at \*3 (Tex. App.—San Antonio

Dec. 31, 2014, no pet.) (mem. op.) (citing *In re J.E.H.*, 384 S.W.3d 864, 872 (Tex. App.—San Antonio 2012, no pet.)).

Citing *In re J.A.J.*, the Department suggests the interests of justice justify a new trial whenever the Department fails to satisfy its heightened burden of proof and when an appellant does not challenge the conservatorship award. Because the facts and procedural posture of *J.A.J.* are substantially different, *J.A.J.* does not support this proposition. The trial in this case lasted one and a half weeks. Sixteen witnesses testified, and the trial court admitted hundreds of pages of documents. This case does not present unique circumstances in which the trial record has not been fully developed. Instead, the Department's evidence simply does not enable a factfinder to reasonably form a firm belief or conviction that termination of Frances's and Thomas's parental rights is in A.G.K.'s or T.L.C.'s best interest. We therefore reverse the trial court's orders of termination and render judgment denying the Department's request to terminate Frances's and Thomas's parental rights. Because Frances and Thomas do not challenge the trial court's appointment of the Department as managing conservator of the children, we affirm that portion of the trial court's judgment.

Luz Elena D. Chapa, Justice