Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio


★ ★ ★  ★ ★ ★

## OPINION

No. 04-11-00668-CV

**IN THE INTEREST OF D.J.H.**, a Child

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2010-PA-01441
Honorable Dick Alcala, Judge Presiding

Opinion by:     Karen Angelini, Justice

Sitting:        Karen Angelini, Justice
                Steven C. Hilbig, Justice
                Marialyn Barnard, Justice

Delivered and Filed:   August 1, 2012

AFFIRMED

Appellant Jose M. appeals the trial court's judgment terminating his parental rights to his son D.J.H. We affirm.

### BACKGROUND

In June 2010, the child the subject of this appeal, D.J.H., was living in his maternal grandfather's home. On June 20, 2010, his mother gave birth to his baby brother. Because his mother and baby brother both tested positive for heroin, D.J.H. was removed from his grandfather's home.[1] At the time of his removal, his father, Appellant Jose M., was in prison. Both D.J.H. and his baby brother were placed in foster care and later placed with their maternal grandmother.

---

[1] D.J.H. and his baby brother have different fathers.

On July 8, 2010, the State filed an original petition, seeking termination of Appellant Jose M.'s parental rights to D.J.H. based on section 161.001(1)(D) of the Texas Family Code. On April 21, 2011, the State amended its petition to add section 161.001(1)(Q) as a ground for termination of Jose M.'s parental rights. On July 5, 2011, the trial court held a bench trial. Jose M. testified by phone. He testified that he was D.J.H.'s father, he had been convicted of aggravated assault with a deadly weapon, and he had been sentenced to three years of imprisonment. His sentence began on March 1, 2010, and would end on February 28, 2013. He testified that his conviction was a result of his shoplifting. According to Jose M., after running from a security guard, he got into a physical altercation with the guard. Jose M. admitted that he had been arrested seven times for theft, all of which occurred after his son was born. He testified that he committed these thefts because he could not support himself. He also admitted that he had used heroin with D.J.H.'s mother and that he had never received treatment for his drug abuse. Jose M. testified that for most of D.J.H.'s life, D.J.H. had lived with his maternal grandmother. While Jose M. had also lived with D.J.H.'s maternal grandmother off and on, he had never paid rent to the grandmother. Nor had Jose M. ever paid child support or otherwise supported his son. He testified he had held a few jobs, but admitted he could not testify about a stable job history. Jose M. emphasized that he had taken some classes in prison to improve himself as a person and parent, and had written to his son every week. Jose M. agreed that the grandmother was a good caregiver and that he wanted his son to remain with his grandmother, but only until he was released from prison.

D.J.H.'s grandmother, Martha H., testified that D.J.H. had lived in her home eight-and-a-half of his nine years. She testified that Jose M. had never provided any financial support for D.J.H. and that she could not remember Jose M. ever having a job. She testified that Jose M. had

stolen from her and that one time, he broke into her room and stole a DVD player she had bought for D.J.H. According to Martha H., D.J.H. would not be safe with his father. She testified that when D.J.H. was about three years old, Jose M. said he was taking D.J.H. to the store to buy ice cream. Instead, Jose M. was seen taking heroin behind a dumpster while D.J.H. was present, and D.J.H. was taken to a children's shelter. Martha H. testified that the next morning, she went to the shelter to get D.J.H. She further testified that she wanted to adopt both D.J.H. and his baby brother.

Kristin Barto, a counselor, testified that she had met with D.J.H. and that D.J.H. was very happy with his grandmother and wanted to remain with her. According to Barto, it was in D.J.H.'s best interests to remain living with his grandmother and baby brother. She testified that D.J.H. did not feel safe with his parents and got the security he needed from his grandmother. According to Barto, D.J.H. had been hurt by his father's absence and his parents' bad choices. She testified that D.J.H. felt much stress from the "legal limbo" he was placed in and from not knowing where he would permanently reside. She recommended that Jose M.'s parental rights be terminated and that D.J.H. be placed with his grandmother.

A foster parent with whom D.J.H. had lived briefly after his removal testified that D.J.H. wanted to live with his grandmother.

Crystal Arevalo, a caseworker, testified that the needs of both D.J.H. and his brother were being met with their grandmother and that D.J.H. wanted to be adopted by his grandmother. According to Arevalo, it would be in D.J.H.'s best interest to terminate Jose M.'s parental rights because D.J.H. needed someone he felt safe with and who could provide stability in his life:

> I'm asking that [Jose M.]'s rights be terminated as he has not been able to provide permanency for this child, stability for this child, basic care for this child. [D.J.H.] feels comfortable with his grandmother. He feels that that is the place for him to be. He feels stable there. And he's bonded to his brother.

Arevalo testified that Jose M. had placed D.J.H. in circumstances that had endangered D.J.H. because of his previous arrests for theft and possession of drugs, including the incident where Jose M. was found using drugs in an alley while D.J.H. was in his care. She testified that although Jose M. had complied with his service plan, his service plan was limited due to his imprisonment. According to Arevalo, Jose M. had not demonstrated the ability to parent, and show support and stability for his son. Thus, she testified that it was in D.J.H.'s best interest for Jose M.'s parental rights to be terminated.

After hearing all the evidence, the trial court terminated Jose M.'s parental rights pursuant to section 161.001(1)(D), finding that Jose M. had engaged in conduct or knowingly placed D.J.H. with persons who engaged in conduct that endangered the physical or emotional well-being of the child. The trial court also terminated Jose M.'s parental rights pursuant to section 161.001(1)(Q), finding that Jose M. had knowingly engaged in criminal conduct that has resulted in his conviction for an offense and confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition. Additionally, the trial court found it was in D.J.H.'s best interest for Jose M.'s parental rights to be terminated. After Jose M. requested findings of fact and conclusions of law, the trial court made the following findings of fact related to this appeal:

(1) At the trial on the merits, Respondent Father [Jose M.] acknowledged that he is the father of [D.J.H.], the oldest child the subject of this suit.

(2) At the trial on the merits, Respondent Father [Jose M.] acknowledged that he is currently serving time on a three year sentence for a felony, namely aggravated assault with a deadly weapon. He was sentenced for that crime on May 13, 2010, yet he testified at trial that his release date is in February of 2013.

(3) At the trial on the merits Respondent Father [Jose M.] also admitted that he has at least two prior convictions for felony theft, as well as a prior conviction for possession of a controlled substance, admittedly heroin; all of these convictions occurred after the birth

of his child and resulted in him serving time in a state jail facility on each of the three separate convictions.

(4) At the trial on the merits, Respondent Father [Jose M.] testified that he was arrested seven times for theft and they were all shoplifting charges because he could not support himself.

(5) At the trial on the merits, Respondent Father [Jose M.] admitted that he has used illegal drugs, namely heroin, since the birth of his child. Respondent Father [Jose M.] further testified that he and the mother of his child were using heroin together and that he never received treatment for his drug problem.

(6) At the trial on the merits, therapist Kristin Barto, who works therapeutically with child [D.J.H.] testified that said child is in "limbo" and needs some permanency for his life; the child is experiencing undue stress because he does not know if he will be able to remain in his current placement. The therapist went on to state that [D.J.H.] is happy in his current placement, he wishes to remain there, and adoption by the current placement would be in his best interest.

(7) At the trial on the merits, therapist Kristin Barto further testified that child [D.J.H.] feels safe in his current placement, but would not feel safe with either parent; further, said child does not want to be separated from his younger sibling, as they are currently placed together.

(8) At the trial on the merits, therapist Kristin Barto concluded her testimony by stating that the choices made by Respondent [Jose M.] have hurt his child.

(9) There was clear and convincing evidence that the child [D.J.H.] is adoptable and that it is in the child's best interest to terminate the parental rights of both respondent parents in this case.

(10) Placement of the child [D.J.H.] into the physical or legal custody of any of the biological parents in this case is contrary to the safety and welfare of the child and is not in the best interest of said child.

## TERMINATION OF PARENTAL RIGHTS

Parental rights may be terminated only upon proof of clear and convincing evidence that the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code, and that termination is in the best interest of the child.[2] *See* TEX. FAM. CODE ANN. § 161.001 (West Supp. 2010). Here, Jose M.'s parental rights were terminated because the trial court found that he

---

[2] We note that Jose M. has not challenged the trial court's best interest finding on appeal.

committed acts prohibited by subsection D and Q of section 161.001(1). Subsection D allows parental rights to be terminated if the trial court finds by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(1)(D) (West Supp. 2010). Subsection Q allows parental rights to be terminated if the trial court finds by clear and convincing evidence that the parent knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition. *Id.* § 161.001(1)(Q).[3] If, as here, the trial court terminated the parent-child relationship on multiple grounds under section 161.001(1), we may affirm on any one ground because, in addition to finding that termination is in the child's best interest, only one predicate violation under section 161.001(1) is necessary to support a termination decree. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

### TERMINATION BASED ON SUBSECTION (Q) GROUNDS

In his first issue, Jose M. argues that the trial court erred in terminating his parental rights based on subsection (Q) grounds because he will be released from prison less than two years from the date the State's amended petition for termination was filed. According to Jose M., the date of the amended petition for termination should control because it was the amended petition that added subsection (Q) as a ground for termination. In response, the State argues that the date its original petition for termination was filed should control, and that if such date is used, Jose M.

---

[3] We note that incarceration alone does not justify termination of parental rights. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Thus, the "care" contemplated by subsection (Q) encompasses arranging for care to be provided by another. *In re Caballero*, 53 S.W.3d 391, 396 (Tex. App.—Amarillo 2001, pet. denied). Once the Department has established the first prong of subsection (Q), the parent must produce some evidence as to how he or she would provide or arrange to provide care for the child during the period of incarceration. *Id.* When that burden of production is met, the Department then has the burden of persuasion that the arrangement would fail to satisfy the parent's duty to the child. *Id.* Jose M. has not argued on appeal that the trial court erred in finding that he was incapable of caring for D.J.H.

will be released from prison more than two years from the date of the filing of the original petition. In support of its position that the filing date of the original petition should control, the State emphasizes that the plain wording of subsection (Q) discusses when "the petition" is filed, not when an allegation is pled. *See* TEX. FAM. CODE ANN. § 161.001(1)(Q) (West Supp. 2010). Further, the State criticizes Jose M.'s argument, explaining that his argument is not logical because subsection (Q) is not a notice provision. We agree with the State.

Subsection (Q) was enacted, not as a notice provision, but instead for the protection of children. In holding that subsection (Q) can apply prospectively, the supreme court explained the purpose of subsection (Q):

> [S]ubsection Q focuses on the parent's future imprisonment and inability to care for the child, not the criminal conduct that the parent committed in the past. By looking at future imprisonment and inability to care for the child, *subsection (Q) purports to protect children whose parents will be incarcerated for periods exceeding two years after termination proceedings begin.* Indeed, the purpose of the State's intervention in the parent-child relationship is t*o protect the best interests of the children*, not to punish parents for their conduct. Although the termination suit can result in a parent's loss of his or her legal relationship with the child, the primary focus is protecting the best interests of the child. . . . Further, in securing what is in the best interests of the child, the State is not pursuing a retributive or punitive aim, but a "purely remedial function: the protection of minors." We recognize that parental-rights termination proceedings also affect a parent's constitutionally-protected relationship with his or her children, a right that presumably cannot be altered through retroactive application of laws. But this Court has stated that "the rights of natural parents are not absolute; protection of the child is paramount. . . . The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." Therefore, in parental-rights termination proceedings, though parents face losing this highly-protected legal relationship, *courts cannot ignore the statute's remedial purpose of protecting abused and neglected children.*

*In re A.V.*, 113 S.W.3d at 360-61 (citations omitted) (emphasis added). The court then explained that by reading subsection (Q) to apply prospectively, "the subsection fills a gap left by other grounds for termination." *Id.* at 360. According to the court,

[a] prospective reading of subsection (Q) allows the State to act in anticipation of a parent's abandonment of the child and not just in response to it. Thus, if the parent is convicted and sentenced to serve at least two years and will be unable to provide for his or her child during that time, the State may use subsection (Q) to ensure that the child will not be neglected.

*Id.*

Given that the purpose of subsection (Q) is to protect children from being neglected, and not to provide notice, it is logical to conclude that when subsection (Q) refers to "the petition," it is referring to the original petition for termination, and not a subsequently amended one adding an allegation for termination under subsection (Q). Thus, we hold that Jose M.'s parental rights were properly terminated under subsection (Q).

### TERMINATION BASED ON SUBSECTION (D)

In his second issue, Jose M. argues that there was factually insufficient evidence to support termination of his parental rights under subsection (D). When a parent challenges the factual sufficiency of the evidence on appeal, we look at all the evidence, including disputed or conflicting evidence. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In reviewing termination findings for factual sufficiency, we give due deference to the factfinder's findings and do not supplant its judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

As noted, subsection D allows for termination of parental rights if the parent knowingly placed or allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(D) (West Supp. 2010).

"Under subsection D, the child's environment, including the environment produced by the parent's conduct, is the source of endangerment to the child." *In re D.C.*, 128 S.W.3d 707, 715 (Tex. App.—Fort Worth 2004, no pet.). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied); *see In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). And, while incarceration alone does not justify termination, *see Boyd*, 727 S.W.2d at 533, a parent's repeated criminal acts may constitute sufficient evidence of conduct that endangers the well-being of a child, *see Zieger v. Tex. Dep't of Family & Protective Servs.*, No. 03-03-00690-CV, 2005 WL 2043812, at *3 (Tex. App.—Austin 2005, pet. denied). Further, a fact-finder may infer from past conduct endangering the well-being of a child that similar conduct will recur if the child is returned to the parent. *Id.*

Jose M. argues that the evidence is factually insufficient to show that he knowingly placed or knowingly allowed D.J.H. to remain in conditions or surroundings that endangered D.J.H.'s physical or emotional well-being because there was no evidence of Jose M.'s abuse or neglect "at any time during the pendency of the case or immediately prior to" D.J.H.'s removal. Of course, immediately prior to D.J.H.'s removal and during the pendency of his removal, Jose M. was incarcerated. Further, although the incident was not recent, there was evidence at trial that when D.J.H. was three years old, Jose M. said he was taking D.J.H. to the store and instead used heroin behind a dumpster with D.J.H. present. As a result, D.J.H. was taken to a children's shelter. There was also evidence that after D.J.H.'s birth, Jose M. had been convicted twice for felony theft and once for possession of heroin, all of which resulted in Jose M.'s incarceration. There was evidence that Jose M. had been arrested seven times for theft, all shoplifting charges resulting from his inability to support himself. Jose M.'s current incarceration for aggravated

assault with a deadly weapon was also related to Jose M.'s propensity for shoplifting, as the aggravated assault with a deadly weapon charge stemmed from his encounter with a security guard. In addition to his shoplifting issues, there was also evidence presented of Jose M.'s drug problem. Jose M. admitted that since the birth of D.J.H., Jose M. had used heroin, sometimes with D.J.H.'s mother, and that he had never received treatment for his drug problem. Given the evidence presented, the fact finder could conclude that Jose M.'s pattern of criminal activity subjected him to the possibility of incarceration, and thereby negatively impacted D.J.H.'s living environment and emotional well-being. *See In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (explaining that because when a parent is incarcerated, he is absent from a child's daily life and is unable to provide support, a parent's pattern of intentional criminal activity that exposes the parent to incarceration is conduct that can negatively impact a child's living environment and emotional well-being); *see also In re V.V.*, 349 S.W.3d 548, 554-55 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). This pattern of intentional criminal conduct, coupled with Jose M. actually endangering D.H.J. when D.H.J. was three years-old, is factually sufficient evidence to support termination pursuant to subsection (D).

## PARENTAL PRESUMPTION

Jose M. argues that the trial court erred in not appointing him joint or sole managing conservator of D.J.H. pursuant to the parental presumption enunciated in *Troxel v. Granville*, 530 U.S. 57 (2000), and codified in section 153.131 of the Texas Family Code. In *Troxel*, 530 U.S. at 68-69, the Supreme Court explained that "there is a presumption that fit parents act in the best interests of their children" and that "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the

rearing of that parent's children." Section 153.131 of the Family Code codifies the parental presumption, requiring a parent to be appointed sole managing conservator or both parents to be appointed joint managing conservators of a child unless the trial court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development. *See* TEX. FAM. CODE ANN. § 153.131 (West 2008).[4]

First, we note that there was no pleading before the trial court requesting that Jose M. be appointed joint or sole managing conservator of D.J.H. Further, Jose M. testified at the hearing that he was not trying to take D.J.H. from his grandmother's custody. And, his attorney argued the following in closing argument: "We're not asking the court for placement of the child with my client. That's not what this case is about. This isn't a custody case, Your Honor." Thus, it is difficult to conclude how the trial court erred in not appointing Jose M. sole or joint managing conservator. Moreover, for the reasons discussed previously, there was sufficient evidence presented at trial from which the trial court could find that the parental presumption had been rebutted by clear and convincing evidence.

### CONCLUSION

We affirm the judgment of the trial court.

Karen Angelini, Justice

---

[4] This parental presumption is subject to "the prohibition in section 153.004," which relates to a history of domestic violence in the home. *See* TEX. FAM. CODE ANN. §§ 153.004, 153.131 (West 2008).