

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00026-CV

_____

IN THE INTEREST OF N.J., A CHILD

On Appeal from the 123rd District Court
Panola County, Texas
Trial Court No. 2016-134

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

## MEMORANDUM OPINION

In a suit brought by the Texas Department of Family and Protective Services (the Department), the trial court terminated Mother's parental rights to her child, N.J., on four grounds specified in Section 161.001(b)(1), subsections (D), (E), (O), and (P), of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (P) (Supp.).[1] The trial court also terminated Father's parental rights to N.J. on three grounds specified in Section 161.001(b)(1), subsections (E), (O), and (N), of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (O), (N) (Supp.).

Father is represented on appeal by court-appointed counsel who has filed a brief in accordance with the requirements of *Anders v. California*, 386 U.S. 738 (1967). Because our independent review of the appellate record establishes that counsel is correct in determining that Father's appeal is frivolous, we affirm the trial court's termination of his parental rights to N.J.

Mother's appeal claims that the evidence was legally and factually insufficient to support the trial court's rulings based on Section 161.001(b)(1), subsections (D), (E), (O), and (P),[2] of the Texas Family Code and that the record is insufficient to support the trial court's finding that termination of Mother's parental rights was in N.J.'s best interests. Because we find that the evidence is sufficient to support the trial court's findings and its conclusion that terminating Mother's parental rights was in the child's best interests, we affirm the trial court's judgment.

---

[1]To protect the confidentiality of the children, we refer to the appellants as Mother and Father, to the child by initials, and to the potential adoptive parent with the pseudonym Tammy. *See* TEX. R. APP. P. 9.8(b)(2).

[2]Because our conclusions on Grounds (D) and (E) are sufficient to sustain the trial court's order of termination, we need not address the allegations of Grounds (O) and (P).

## I. The Record Establishes that Father's Appeal is Frivolous

"The procedures set forth in *Anders* are applicable to an appeal from a trial court's order terminating parental rights when an appellant's appointed appellate counsel concludes that there are no non-frivolous issues to assert on appeal." *In re G.P.*, 501 S.W.3d 252, 253 (Tex. App.—Texarkana 2016, no pet.) (citing *In re P.M.*, 520 S.W.3d 24, 27 n.10 (Tex. 2016) (per curiam)). The *Anders* brief filed by Father's counsel presents a professional evaluation of the record demonstrating why there are no arguable grounds for reversal. Counsel has established that she provided Father with copies of the brief and a motion for access to the appellate record and that she notified Father of his right to file a pro se response. By letter dated August 6, 2021, this Court informed Father that any pro se response was due on or before August 26, 2021. Father did not exercise his right to receive a copy of the record or to file a pro se response.

Court-appointed counsel's brief meets the requirements of *Anders* by providing a professional evaluation of the record and stating why there are no arguable grounds for reversal on appeal. *See Anders*, 386 U.S. at 744. Having thoroughly reviewed the record and counsel's brief, we agree with counsel's assessment that Father's appeal is frivolous and without merit. We find nothing in the record that could arguably support the appeal. *See id.* (emphasizing that the reviewing court—and not counsel—determines, after full examination of proceedings, whether the appeal is wholly frivolous). We affirm the trial court's final order terminating Father's parental rights to N.J.

However, we deny counsel's motion to withdraw. In the parental-rights termination context, "counsel's belief that the client has no grounds to seek further review from the court of

3

appeals' decision" is not "good cause" sufficient to justify counsel's withdrawal. *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam). Instead, counsel's duty to his client extends through the exhaustion or waiver of "all appeals in relation to any final order terminating parental rights." TEX. FAM. CODE ANN. § 107.016(3)(B). If Father wishes to pursue an appeal to the Supreme Court of Texas, "appointed counsel's obligations can be satisfied by filing a petition for review that satisfies the standards for an *Anders* brief." *In re P.M.*, 520 S.W.3d at 27–28.

## II. Background

### A. The Department's Investigations

Mother and her children[3] had previously been the subject of an investigation by the Department in 2016. Case worker Sara Watson supervised Mother during the 2016 investigation. Watson testified that, during the 2016 investigation, Mother "was not cooperative in regards to drug testing" and "did not complete in[-]patient rehab" for substance abuse. While Mother did complete the required substance-abuse assessment and then started substance-abuse counseling, when the counselor told Mother she needed in-patient rehabilitation, Mother quit seeing the counselor and never attended in-patient rehabilitation. Watson described Mother's uncooperativeness in assessing her drug use as follows:

> I was only ever able to get two drug tests from her throughout the case, and they were both oral swabs. One of the oral swabs came back negative and the other one came back positive, I believe for -- it was either codeine or [h]ydrocodone. Every other time I had tried to send her to drug test, there was always some reason why she didn't show up and go. I had done several other oral swabs in the office. And she would do things like chew on them. And then when I'd send them back they would -- or send them into the lab to be tested, they would say they were invalid.

---

[3]N.J. had four siblings, though none are involved in this litigation. The four other siblings had all been placed with their respective fathers by the time N.J.'s case came to trial.

4

During the 2016 investigation, one of Mother's requirements was to participate in a psychiatric evaluation. According to Watson, Mother went to the appointment for this evaluation, "but she quit and just walked out part of the way through the evaluation because the person that was evaluating her told her that she would probably be put on a waiting list." The 2016 investigation ended with Mother and her great aunt (Great Aunt) being named temporary managing conservators and Great Aunt being named primary managing conservator. According to Watson, the 2016 conservatorship decision was made because Mother (1) had several pending criminal charges and "was fixing to be going to jail, . . . for several months"; (2) did not appear to have a place to live; and (3) failed to complete the psychiatric evaluation and therapies ordered. Mother was not cooperative during the drug testing and did not complete in-patient rehabilitation. The trial court made a final ruling in January 2017 that the children were to live with Great Aunt and that Mother was only allowed supervised visits.

Watson also supervised the Department's 2019 investigation of Mother, which led to the removal of the children in the summer of 2019 and ultimately to the termination at issue in this appeal. During most of the 2019 investigation, Mother was in the penitentiary, and Watson revamped Mother's service plan by adding parenting classes and making substance abuse resources available to her while incarcerated. Even so, Mother only reported to Watson that "the wait list was too long." At the time of the termination hearing, in March 2021, N.J. was about six-and-one-half years old. Mother had been incarcerated more than two years of that time, between the two Department cases.

5

Watson testified that she believed termination of Mother's parental rights and adoption by N.J.'s aunt, Tammy, was in N.J.'s best interest. Watson expressed concern about N.J. being raised alongside her siblings. Without specifics, Watson testified that the Department was concerned about the siblings' behavior impacting N.J. The siblings were "doing illegal things on the Internet for people to see," and the children's grandmother "[had] influenced [those] older children to do things that [had gotten] them into trouble while they were in [her] care." Finally, Watson said that two other aunts were in cases with Department involvement. All of those circumstances contributed to instability regarding Mother's care of N.J. Compared to those circumstances, the stability of Tammy's home and lifestyle had greatly benefited N.J.'s development.[4]

Cordia Page was the Department investigator who worked on the 2019 investigation. In May 2019, Page received a report of Mother driving under the influence of methamphetamine and alcohol with her children in the car. On that occasion, there were also allegations that Mother had been shoplifting. Page also received a report that Mother "had got[ten] into a physical altercation [while] her children were with her, and her oldest child was fighting a lady and law enforcement was involved" and "that there was an infant with the mother at the time of the incident, but there were no children hurt, harmed or injured." Page then learned that, despite the trial court's ruling

---

[4]When asked by Mother's attorney whether there was a potential for Mother to eventually have some role in N.J.'s life, Watson said, "I feel like the home she's in right now[, Tammy's,] is stable," and that Tammy was able to provide a "mother role" Mother could not, due to her incarceration. Watson testified she did believe a "relationship with [Mother] would be beneficial for [N.J.]" "because [Mother] is [N.J.'s] biological mom." The two had spent years together, and "you can't erase someone's memory and replace their biological mom with someone else." Watson said she believed Mother could be "rehabilitated to a point of being able to parent her child," but her situation at the time of trial precluded this. If Tammy "would be willing to allow the opportunity for [Mother] to still be involved in [N.J.'s] life," Watson felt "that [would] be in the best interest of [N.J.]"

in 2017 that the children were to live with Great Aunt, the children were living with Mother without supervision.

Page explained his difficulties locating Mother during the 2019 investigation. It took almost two months from the initial report in May 2019 until he contacted her. Page described going to the home on "several different occasions" where he and a special investigator "would hear people in the home[ and] would see people looking out the window, but nobody would ever come to the door."[5] Mother finally contacted Page. He went to meet her at the home with law enforcement officers, who arrested her for felony warrants.[6] At that point, N.J. and the other children were removed from the home and placed under the Department's conservatorship. Great Aunt was authorized to supervise Mother's visits but "was not in the home full-time . . . was living somewhere else, then she got sick and had to move in," apparently with Mother. According to Page, the children were no longer living in Great Aunt's home "because she wasn't able to control them."[7]

Page also learned that the children had been inconsistent in their school attendance. He testified, "[T]hey were not going to school at all times. They were here and there, would go some days and would not go." Page said that school staff had noticed a change in the children's behavior since they resumed living with Mother, but Page did not specify those changes. When Page administered a drug test to Mother, she was positive for hydrocodone ingestion. Page testified that

---

[5]Page testified that he was concerned the children may have been left alone since nobody answered the door.

[6]Mother was arrested on July 15, 2019.

[7]Page's testimony identifies the primary managing conservator as an aunt with a slightly different first name than Great Aunt. Reading the record as a whole, it is clear that the conservator to whom he refers was in fact Great Aunt.

Mother did have a prescription for hydrocodone, but his affidavit submitted after his investigation stated that she did not. His investigation also yielded concern that Mother had seen different doctors at different hospitals for hydrocodone.

## B. Social Worker Davis's Evaluation

Deborah Davis, a licensed clinical social worker, worked with N.J. for about seventeen months. Beginning in October 2019, Davis saw N.J. once a week for ten months. "As [N.J.'s] goals were achieved," the sessions were held every two weeks. The two had met monthly for the six months before trial. In the early sessions, Davis suspected N.J. was not being completely honest with her. As N.J. developed trust in Davis, the counselor felt the child became more honest to the point Davis felt N.J. was being "genuine." Davis found no indication that N.J. had been coached.

When Davis first saw N.J., she could not hold the child's attention or get her to sit still. N.J. "had real difficulty focusing" and "demonstrated hyper and unfocused behaviors." Davis described N.J. as initially "unfocused" and "kind of all over the place." From those early sessions to the last one, about three weeks before trial, N.J.'s behavior was "night and day." At the time of trial, N.J. was "very respectful to authority"; had "really, really good manners"; said "[n]o ma'am" and "yes, ma'am"; and asked her caregiver for permission to do things. Additionally, Davis testified that toward the end of their sessions, N.J. expressed herself better and no longer used inappropriate language.

Davis further testified that N.J.'s placement with a relative, which had commenced within a couple months of the most recent removal by the Department, was very beneficial to the child.

8

N.J. had been staying with Tammy,[8] and Davis opined that the child had bonded with Tammy. By the time of the termination hearing, N.J. referred to Tammy as her mother.

Davis's review of N.J.'s case history caused Davis concern about N.J.'s contact with her siblings. Apparently, during the period where the children had left Great Aunt's care and resumed living with Mother, one of N.J.'s older sisters had for some time been N.J.'s caregiver or served in a parental role. N.J. told Davis that her sixteen-year-old sister "would hit her and hold her down and say ugly things to her."[9] Although she said she was afraid of her siblings, N.J. maintained a wish to see them and missed them. Davis thought it was important for N.J. to maintain her relationship with her siblings but stressed that going forward, visits must occur in therapeutic, supervised environments, without N.J. being placed "at risk or at harm"; Davis said, "I think it would be good for her to know her siblings as long as it's healthy."[10]

Over the course of about a year and a half working with N.J., Davis said that eventually N.J. quit talking about returning to Mother; rather, N.J. began saying she wanted to continue living with Tammy. Davis testified, "I think she truly want[ed] to stay with [Tammy]. . . . I do as a therapist believe that she [had] a very close bond with [Tammy] and that she want[ed] to stay with

---

[8]*See supra* note 1.

[9]N.J. also told Davis, "My sister hits me all the time."

[10]Tammy testified that she curtailed N.J.'s contact with her siblings. She described situations where N.J.'s teenage siblings "constantly . . . disrespected" her; one thirteen-year-old sibling called Tammy and "curs[ed] [her] out." Much of Tammy's testimony, given via Zoom, was interrupted with technical difficulties. The record contains testimony where Tammy said she had abusive or rude voicemail and text messages from various of the teenage siblings. She said she ceased contact with that part of the family because of "stuff that was being posted on social media with the kids fighting and . . . them using illegal drugs and stuff like that."

[Tammy]." Over the course of Davis's sessions with N.J., the child evolved to "rarely mention[ing] her biological mother."

When asked her opinion as to N.J.'s best interests, Davis recommended terminating Mother's parental rights and placing N.J. with Tammy "where she[] [would] receive stability, consistency, and all of her needs [would] be met." Davis testified that allowing N.J. to continue living with Tammy without terminating Mother's parental rights "could get very confusing for" N.J. According to Davis, "[I]t's better in these situations that a child think of one primary parent as mom."

### C. N.J.'s Aunt Tammy

Tammy echoed many of Davis's observations. When N.J. first came to live with her, Tammy received complaints from teachers. N.J. would not listen to adults or follow directions. By the time of trial, though, N.J. addressed adults as "sir" and "ma'am" and was receptive to and followed directions. In addition to her improved focus in school, N.J. had grown more respectful to adults. N.J. seemed "more secure," especially since, when she first came to Tammy's, she seemed "unsure about things" like where she would ultimately live. N.J. seemed to enjoy the structure of her daily routine; she very much enjoyed cheerleading and playing softball.[11] Tammy had been approved to be an adoptive parent and was ready to adopt N.J.

---

[11]Tammy said that, when N.J. first moved in, "she was always flipping around the house." Tammy testified, "[I thought,] well, I'm going to hone in on that. So I put her in gymnastics." The inference was that N.J. enjoyed this activity too, but Tammy's Zoom connection cut out briefly.

### D.    Mother's Testimony

In her testimony, Mother acknowledged multiple criminal convictions.  The Department produced judgments from seventeen state-jail felony and three second-degree felony convictions. Of the state-jail felonies, thirteen were for theft of property valued less than $2,500.00 with prior theft convictions,[12] to which Mother pled guilty on the same date in October 2017.  On that date, she also pled guilty to the state-jail-felony offense of driving while intoxicated with a child in the vehicle.[13]  In January 2018, Mother was sentenced to six years' imprisonment for possession of a controlled substance[14] and burglary of a habitation.[15]  On August 20, 2019, she pled true to and was adjudicated guilty of robbery[16] and was sentenced to twenty years' confinement.  At the termination hearing, Mother testified that she had recently been denied parole.[17]  Mother had criminal trespass warnings barring her from several local merchants.  Mother also acknowledged being incarcerated from 2012 to 2014 and 2017 to 2018, and she was incarcerated at the time of the termination hearing.

She acknowledged an addiction to Xanax, which "caused [her] to shoplift" and "do crazy things that [she] didn't remember."  Regarding her substantial criminal history, Mother explained

---

[12]*See* TEX. PENAL CODE ANN. § 31.03(e)(4)(D).

[13]*See* TEX. PENAL CODE ANN. § 49.045.

[14]*See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(d)(4).

[15]*See* TEX. PENAL CODE ANN. § 30.02(c)(2).

[16]*See* TEX. PENAL CODE ANN. § 29.02.  In December 2016, Mother pled guilty to robbery and was placed on deferred adjudication community supervision.

[17]Barring release on parole, Mother's projected date of release from prison is in 2038.

that she "never knew a lot of charges that [she] got because [she] was on Xanax not knowing what [she] was doing." She did not have a prescription for Xanax and purchased it illegally. She began using it in 2012 after the murder of her father and had "been trying to cope with medication ever since then."[18]

When asked about a time in early 2019 when the police came to her home, she denied it was because she was arguing with her oldest child. Rather, Mother testified that she called the police to "scare" her daughter "[b]ecause she was talking back." She continued, "I told her if she didn't want to listen to me, she would listen to the police." Mother said that she had last been employed in 2019 and that a lack of reliable transportation led to her losing the job. While in prison, Mother said an aunt and Great Aunt cared for the children. At one point, Great Aunt was hospitalized, and one of the children's aunts took them.[19]

At the time of the termination hearing, Mother had served two years of a twenty-year sentence for robbery. She had the above-described theft convictions and had previously been incarcerated on those convictions.

## III. Legally and Factually Sufficient Evidence Supports Termination of Mother's Parental Rights

### A. Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting

---

[18]Mother also admitted to using hydrocodone, promethazine, codeine syrup, and Xanax from 2012 until her incarceration. She denied, though, ever having her children with her when she used drugs. She also claimed never to have had her children with her when she was caught shoplifting, which resulted in the multiple theft convictions.

[19]From the record, it seems that this was another aunt, not Tammy.

12

*Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "This Court is . . . required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007 (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009))). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex.

13

App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *H.R.M.*, 209 S.W.3d at 108 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). "[I]n making this determination, we . . . undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *In re C.H.*, 89 S.W.3d at 26)). "We also recognize that the trial court, as the fact-finder, is the sole arbiter of a witness' demeanor and credibility, and it may believe all, part, or

none of a witness' testimony." *In re A.M.*, No. 06-18-00012-CV, 2018 WL 3077784, at *3 (Tex. App.—Texarkana June 22, 2018, pet. denied) (mem. op.) (citing *H.R.M.*, 209 S.W.3d at 109).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)) (citing *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *In re C.H.*, 89 S.W.3d at 26)).

"Only one predicate finding under Section 161.001[(b)(1)] is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *Id.* at 923 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting *A.V.*, 113 S.W.3d at 362) (citing *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.)). "Even so, in *In re N.G.*, the Texas Supreme Court held that due process demands that we review the evidence supporting findings under Grounds D and E when they are challenged on appeal because termination of parental rights under these Grounds 'may have implications for . . . parental rights to other children.'" *In re L.W.*, 609 S.W.3d 189, 195–96 (Tex. App.—Texarkana 2020, no pet.) (quoting *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam)). "As a result, we focus our analysis on Grounds D and E." *Id.* at 196.

**B.    The Record Supports the Trial Court's Finding Under Subsection (D)**

"Subsection (b)(1)(D) permits a termination when the parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'"  *Id.* at 199 (quoting TEX. FAM. CODE ANN. § 161.001(b)(1)(D)).  "Under [Section 161.001(b)(1)(D)], we must examine the time before the children's removal to determine whether the environment itself posed a danger to the child's physical or emotional well-being." *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.).  "A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards." *In re N.B.*, No. 06-12-00007-CV, 2013 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.).  "[S]ubsection (D) permits termination [of parental rights] based on a single act or omission [by the parent]." *In re L.C.*, 145 S.W.3d at 797; *see In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied).  "[A]busive or violent conduct by a parent or other resident of a child's home can produce an environment that endangers the physical or emotional well-being of a child." *In re B.E.T.*, No. 06-14-00069-CV, 2015 WL 495303, at *5 (Tex. App.—Texarkana Feb. 5, 2015, no pet.) (mem. op.) (quoting *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied)).

"Similarly, 'a parent's failure to remove [her]self and [her] children from a violent relationship endangers the physical or emotional well-being of the children.'" *Id.* (quoting *In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.) (citing *D.O. v. Tex. Dep't of Human Servs.*, 851 S.W.2d 351, 354 (Tex. App.—Austin 1993, no writ), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 267 ("finding evidence of child's residence in unstable household

where violence frequently occurred and where ex-felons engaged in ongoing criminal activity resided was sufficient to sustain termination based on finding parent allowed child to remain in surroundings that endangered physical or emotional well-being")).

"Moreover, illegal drug use by a parent likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *In re L.E.S.*, 471 S.W.3d at 925 (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)); *see In re N.B.*, 2013 WL 1605457, at *9.

There was evidence that at least one of N.J.'s siblings hit her and was verbally abusive to N.J. before the children were removed from Mother's care. N.J. told Davis that she was afraid of her siblings. There was also evidence that, although Mother was required to only have supervised visitation with her children due to the trial court's order in January 2017, the children lived with Mother unsupervised. Mother admitted that she had been addicted to Xanax, that she obtained Xanax illegally, and that the drug made her do "crazy things."

"As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). "[W]hile incarceration alone does not justify termination, a parent's repeated criminal acts may constitute sufficient evidence of conduct that endangers the well-being of a child." *In re D.J.H.*, 381 S.W.3d 606, 613 (Tex. App.—San Antonio 2012, no pet.) (citation omitted). "Further, a fact-finder may infer from past conduct endangering the well-being of a child that similar conduct will recur if the child is returned to the parent." *Id.* While the record is not clear, it appears Mother had been incarcerated approximately one to two

17

years of N.J.'s life, if not more. Also, in the years immediately before the Department's removal of N.J. and her siblings, Mother had been convicted and sentenced to at least fourteen state-jail felonies and two second-degree felonies.

The record, as a whole and taken in the light most favorable to the trial court's ruling, supports an affirmative finding under ground (D). As a result, we overrule Mother's first point of error.

### C. The Record Supports the Trial Court's Finding Under Subsection (E)

"Subsection (b)(1)(E) permits termination when the parent has 'engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.'" *In re L.W.*, 609 S.W.3d at 200 (quoting TEX. FAM. CODE ANN. § 161.001(b)(1)(E)). "Under subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *In re L.E.S.*, 471 S.W.3d at 923 (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Further, termination under subsection (E) must be based on more than a single act or omission. Instead, a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.))); *see Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d 358, 366–67 (Tex. App.—Texarkana 2007, no pet.).

"While we recognize that imprisonment, standing alone, is not conduct [that] endangers the physical or emotional well-being of the child, 'intentional criminal activity which expose[s] the parent to incarceration is relevant evidence tending to establish a course of conduct

18

endangering the emotional and physical well-being of the child.'" *In re L.E.S.*, 471 S.W.3d at 924 (quoting *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (per curiam) (citing *Allred v. Harris Cty. Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.))).

Many of the instances cited in our discussion of subsection (D) apply to our evaluation of the court's finding regarding subsection (E). In addition, we point to Mother's conviction for robbery in August 2019. Not only did that conviction result in a sentence of twenty years, for which Mother had already been once denied parole, but robbery is an "inherently dangerous offense." *Fraser v. State*, 583 S.W.3d 564, 589 (Tex. Crim. App. 2019) (Slaughter, J., dissenting). "A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021). While almost all of her other convictions were for property theft of some kind, this presents some evidence of an escalation in Mother's criminal activity. *Cf. id.* at 315 (parent's "increasingly serious crimes" could be considered "under subsection (E)").

"[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. Drug use and its effect on a parent's life and h[er] ability to parent may establish an endangering course of conduct." *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.) (quoting *N.S.G.*, 235 S.W.3d at 367–68). We cite again to Mother's admitted addiction to Xanax and frequent drug use. "Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support

termination under section [161.001(b)(1)(E)]." *Walker v. Tex. Dep't Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Vasquez v. Tex. Dep't Protective & Regulatory Servs.*, 190 S.W.3d 189, 195–96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child")). Mother's pervasive criminal conduct, her extensive drug use, and the totality of the evidence support the trial court's finding under subsection (E). As a result, we overrule Mother's second point of error.

## IV. Best Interests of the Child

### A. Standard of Review

Mother also argues that the evidence was neither factually nor legally sufficient to support the trial court's finding that termination of her parental rights was in N.J.'s best interests. We disagree and affirm the trial court's finding.

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interests of the child, courts consider the following *Holley* factors:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals,

20

(7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 819 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b). "It is unnecessary to prove all of these factors as a condition precedent to parental-rights termination." *In re C.A.J.*, 459 S.W.3d 175, 183 (Tex. App.—Texarkana 2015, no pet.) (citing *In re C.H.*, 89 S.W.3d at 27). "Further, we may consider evidence used to support the grounds for termination of parental rights in the best interest analysis." *In re L.W.*, 609 S.W.3d at 203 (citing *In re C.H.*, 89 S.W.3d at 28).

### B. Analysis of the *Holley* Factors

#### 1. Desires of the child

Davis testified that N.J. had expressed to Tammy that she wished to remain in Tammy's home. Davis also testified that remaining in Tammy's care was very beneficial to N.J. Tammy's testimony suggested that the child enjoyed and benefited from living with her. This factor weighs in favor of the trial court's finding.

#### 2. Emotional, physical needs of the child currently and in the future

That this case began with allegations of neglectful behavior by Mother suggests that N.J. was not having her emotional and physical needs met while living with Mother. Indeed, N.J. was not supposed to be with Mother, unless supervised. We observe that this was the second removal of N.J. by the Department within four years of the child's birth. Testimony from Davis and Tammy established that N.J. was benefitting from living with Tammy, had a secure and positive environment, and had demonstrated improved behavior since living with Tammy. N.J. was

21

enjoying her extracurricular school activities and had benefited from Davis's counseling, though the record is not clear whether N.J. has continued or would continue sessions with Davis after the termination hearing. Davis testified that the child's "social, emotional, physical, educational, [and] medical needs" were met while in Tammy's care. As a result, this factor weighs in favor of the trial court's finding.

### 3. Parental abilities of the individuals seeking custody

N.J. had been living with Tammy more than a year. In that time, N.J. had demonstrated progress in her maturity and ability to abide by instructions and demonstrate appropriate behavior. Davis testified about the benefits of living with Tammy and that Tammy had demonstrated her commitment and ability to provide a safe, steady environment for N.J.'s continued growth and development. Thus, this factor weighs in favor of the court's finding.

### 4. Programs available to assist individuals seeking custody

We do not find much direct testimony or evidence in the record relative to this factor. Watson testified that she modified Mother's service plan to require services and plans available to Mother in the penitentiary. Mother did not avail herself of those programs and just repeatedly told Wilson the waiting lists were too long. We weigh this factor in support of the trial court's finding.

### 5. Plans for the child and stability of the home

Much of the above-summarized evidence is applicable to these criteria. Tammy had intentions of adopting N.J., thus solidifying many of the improvements and positive changes observed in the child's behavior since placement with Tammy. Tammy said that she intended to continue to help N.J. re-integrate with her siblings, with a prerequisite being healthy, appropriate

behavior by the siblings. It was implied that N.J. would continue her involvement in cheerleading, softball, and gymnastics, which were beneficial to the child and which she enjoyed. Also implied in the testimony of Tammy and Davis was the stability of Tammy's home, especially in contrast to the unstructured environment N.J. experienced living with Mother and Great Aunt. These criteria weigh in support of the trial court's findings.

> **6.** **The acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent**

The acts and omissions of Mother's care have been summarized above. She admitted to chronic drug abuse, though she denied indulging in her children's presence. Her recidivist criminal activity and drug use demonstrate at least significant periods of irresponsible, if not dangerous, behavior, in addition to the significant periods of incarceration that have followed. As for Mother's excuses, she either pointed to her drug dependencies or simply denied aspects of her prior behaviors.

Upon review of all the evidence, we find that there is legally and factually sufficient evidence from which the trial court could have found that termination of Mother's parental rights to N.J. was in the child's best interests. As a result, we overrule Mother's last point of error.

## V.       Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted:       September 28, 2021
Date Decided:         November 1, 2021