Opinion issued November 3, 2022



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00375-CV

———————————

## IN THE INTEREST OF I.F., A CHILD

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-00359J**

---

## MEMORANDUM OPINION

In this appeal, D.F. (Mother) challenges the trial court's final decree terminating her parental rights to her minor child, I.F. (Ivy), based on findings that she endangered Ivy, she constructively abandoned Ivy, she failed to comply with the provisions of a court order specifying the actions necessary to obtain the return of Ivy, and termination of her parental rights was in Ivy's best interest. *See* TEX.

FAM. CODE § 161.001(b)(1)(D), (E), (N), (O); *id.* § 161.001(b)(2). In five issues, Mother argues that the evidence was legally and factually insufficient to support the trial court's findings made pursuant to Texas Family Code subsections 161.001(b)(1)(D), (E), (N), (O) and that the evidence was legally and factually insufficient to support the trial court's finding that termination of Mother's parental rights was in Ivy's best interest.

We affirm.

## Background

Mother gave birth to Ivy on April 9, 2013.[1] Ivy came into DFPS's care on March 3, 2021. Law enforcement personnel found Ivy, who was seven years old at the time, and her younger brother, who was five years old at the time, alone in a hotel room. Law enforcement detained a man referred to as "C.B." who had rented five hotel rooms in his name. Ivy was in one of the rooms without adult supervision, and she had no way to contact Mother. The children reported at the time law enforcement found them that Mother had brought them food and had been gone for approximately 40 minutes. Mother was eventually located sleeping in another of C.B.'s rooms, where law enforcement found methamphetamine, crack

---

[1] The trial court also terminated the parental rights of Ivy's unknown father. Mother testified that she did not know the name of Ivy's biological father. Mother was in a relationship with another man, D.K., who was determined not to be Ivy's biological father but who acted as a father figure. Mother is the only parent who is party to this appeal.

pipes, and other drug paraphernalia. C.B. did not identify the nature of his relationship with Mother.

When the DFPS investigator returned several hours later to interview the children, they were again alone in the hotel room. Ivy told the investigator that she was not scared to be alone in the room and that her Mother was coming right back. Mother did return several minutes later. Mother acknowledged to the investigator that she was living in the hotel. Mother was not working at that time, and she told the investigator that a friend of her boyfriend was paying for the hotel rooms. Ivy was taken into emergency custody by DFPS.[2] DFPS petitioned for termination of Mother's parental rights to Ivy and for managing conservatorship, and the trial court named DFPS as Ivy's temporary managing conservator.

Ivy was placed with a foster family upon removal. Subsequently, Mother identified a relative—her maternal great aunt—who could care for Ivy. Ivy was placed with the aunt for several months, and her foster family maintained contact with her and continued to visit Ivy. The maternal great aunt then died, and Ivy returned to live with the foster family with whom she had originally been placed, and where she has remained.

---

[2]     DFPS's case file indicated that Ivy's brother, T.F., had been reported missing by his father, who had been unable to find Mother in order to exercise his period of custody under a standard possession order. T.F. was returned to his biological father and is not a subject to this suit.

The trial of this case commenced on March 8, 2022. The trial court admitted DFPS's records from the case including the removal affidavit, emergency orders, Mother's family service plan, and drug test orders. The trial court also admitted evidence of Mother's criminal history. Mother was charged in June 2019 with assault against a family member. The DFPS investigator's affidavit, which was admitted into evidence at trial, indicated that Mother had assaulted her father. Mother told the caseworker that she suspected her father had dementia, and he "charged" at her for no reason while she was mopping the floor. When he started attacking her, Mother "forgot who he was and defended herself which is how she got charged with family violence."

Mother was also charged in September 2020 with burglary with intent to commit theft. Both charges were later dismissed. Mother was also charged with burglary of a building in December 2020, but that charge was reduced to a conviction for criminal trespass and resulted in Mother spending approximately 90 days in jail during the summer of 2021.

The DFPS caseworker, K. Lewis, testified that Ivy was currently placed in an adoptive foster placement. Ivy was very bonded to her foster family. Mother had not had Ivy enrolled in school for more than a year, but the foster placement had gotten her enrolled and worked hard to help her catch up on the schooling she had missed. The child advocate assigned to Ivy's case likewise testified that Ivy

4

adapted "extremely well" to being in the foster home: "She's very comfortable, she's thriving, doing activities, doing well in school."

Lewis further testified regarding the events that brought Ivy into DFPS's care and other instances of Mother's neglectful supervision. Lewis testified that Mother was staying in a hotel room that was raided by law enforcement. The room Mother was found in had drugs and a gun that belonged to the man staying in Mother's room. Law enforcement found Ivy, who was seven years old at the time, and her younger brother, who was five years old at the time, unattended in a different hotel room.

Lewis related another incident of neglectful supervision that occurred in 2019, when Ivy and a sibling were left in the care of woman Mother had known "less than six months" who was "supposedly watching the children overnight for a few hours." The care giver left to go get pizza, and Ivy's younger sibling "was able to get his hands on a lighter and set . . . a bed sheet on fire, which ignited the entire motel." In November 2020, Ivy's brother was found wandering alone in his underwear in the hotel parking lot, looking for his mother. Mother told the investigator in that case that she was moving something from her car and told the child to stay in his room. She contended that she was gone less than ten minutes when she returned to find the police with her child.

Lewis also testified that Mother had multiple drug tests in which she tested positive for methamphetamine and amphetamine use, including in March 2021, September 2021, and October 2021. Lewis testified that these positive drug tests were a violation of Mother's family plan of service, which also required Mother, among other things, to maintain stable housing and income, attend parenting classes and substance abuse assessment, and refrain from criminal activity. Lewis testified that Mother had completed no services. Lewis further testified that Mother visited Ivy approximately 10 times during the year that the case was pending, but Mother missed some opportunities to visit Ivy while she was incarcerated for approximately two months during the time that Ivy was in DFPS custody.

Lewis testified that DFPS believed it was in Ivy's best interest to terminate Mother's parental rights because Mother continued to test positive for drug use throughout the case, Mother did not comply with the family plan of service, and Mother had a history with DFPS of neglectful supervision for leaving her children unsupervised.

Mother also testified at trial. She acknowledged that Ivy was removed from her care when the child was found in a hotel room without another adult present. She testified, however, that the child was not alone because she was asleep in another room belonging to "[a]n associate at the time." Mother further admitted that the room she was staying in "had drugs and guns [but one of the guns] was a

paintball gun[.]" Mother admitted she used methamphetamine while she was in the hotel where Ivy was found and removed from her care. Mother also admitted that she used methamphetamine in November 2021.

Mother testified that she had been incarcerated from June 2, 2021, until the "end of August or right at the beginning of September." Mother further testified that she completed her substance abuse assessment. She stated that the counselor who did the assessment recommended counseling and anger management due to the altercation with her father, but the follow-up appointment was canceled, and Mother was unable to coordinate with her caseworker to get them rescheduled. Lewis, however, was unsure where Mother had completed this assessment, stating, "If [Mother's] referring to the Best Group, . . . I did reach out to them, and they stated that no services were performed. So if she completed a substance abuse assessment, I do not have that on file."

Mother further testified that, at the time of trial, she was living in her great aunt's home and working for her brother, so she was able to maintain stable housing and pay her bills. Furthermore, at the time of trial, Mother did not have any pending criminal charges, nor was she on probation. Mother acknowledged that she had not provided proof of her employment or housing to DFPS.

The trial court found that Mother engaged in conduct supporting termination of her parental rights pursuant to Family Code subsections 161.001(b)(1)(D), (E),

7

(N), and (O). The trial court further found that termination of Mother's parental rights to Ivy was in the child's best interest. Accordingly, the trial court rendered its final order terminating Mother's parental rights, and this appeal followed.

## Sufficiency of Endangerment Findings

In her first and second issues, Mother argues that the evidence was legally and factually insufficient to support the trial court's findings that Mother endangered Ivy pursuant to subsections (D) and (E).

### A. Standard of Review

A trial court may order termination of the parent-child relationship if it finds one of the statutorily enumerated predicate grounds for termination and that termination of parental rights is in the best interest of the children. TEX. FAM. CODE § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). DFPS must prove both elements—a statutorily prescribed predicate finding and that termination is in the child's best interest—by clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d at 802 (stating that federal due process clause and Texas Family Code both mandate "heightened" standard of review of clear and convincing evidence in parental-rights termination cases). The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the

truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re E.N.C.*, 384 S.W.3d at 802.

"Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In reviewing the evidence's factual sufficiency, we consider the entire record, including disputed evidence. *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

## B.    Analysis

In her first two issues, Mother argues that the evidence was insufficient to support the trial court's endangerment findings pursuant to subsections 161.001(b)(1)(D) and (E).

Section 161.001(b)(1)(D) provides that a court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or

surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Section 161.001(b)(1)(E) provides that a court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

The word "endanger" as used in section 161.001 "means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). In this context, endanger means to expose to loss or injury or to jeopardize. *Id.*; *In re A.J.H.*, No. 01-18-00245-CV, 2019 WL 190050, at *7 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.) (mem. op.); *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (endangerment includes jeopardizing child's emotional or physical health)..

Endangerment under subsection (D) arises from a child's environment and a parent's disregard for the potential for danger created by the environment. *In re A.J.H.*, 2019 WL 190050, at *7; *Jordan*, 325 S.W.3d at 721. Although "the focus of subsection (D) is on the child's living environment and not on the parent's conduct, parental conduct may produce an endangering environment." *In re M.T.W.,* No. 01-11-00162-CV, 2011 WL 6938542, at *12 (Tex. App.—Houston

[1st Dist.] Dec. 29, 2011, no pet.) (mem. op.) (citing *Jordan*, 325 S.W.3d at 721); *see V.P. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.) (holding that "environment" refers to both child's living conditions and environment produced by parent's conduct in child's home). For example, abusive or violent conduct or illegal drug use by a parent or other resident of the child's home may produce an endangering environment. *In re M.T.W.*, 2011 WL 6938542, at *12.

Endangerment under subsection (E) arises when a parent's course of conduct jeopardizes the child's physical or emotional well-being. *See In re A.J.H.*, 2019 WL 190050, at *8. This course of conduct includes acts, omissions, and failures to act, but it "must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent." *In re M.T.W.*, 2011 WL 6938542, at *12 (citing *Jordan*, 325 S.W.3d at 723). Because the evidence concerning these two statutory grounds for termination is often interrelated, we may consolidate our examination of the evidence to support both grounds. *See In re A.J.H.*, 2019 WL 190050, at *8.

Mother argues that the record was "silent as to any inherently dangerous conditions of the child's living environment," as required to support findings under subsection (D). She asserts that Ivy was not in immediate danger when law enforcement personnel found her and her younger brother alone in their hotel

11

room. She further asserts that she had not been gone for more than an hour and was in another room in the same hotel, and, thus, her conduct did not rise to the level of endangerment. Mother's arguments do not address the entirety of the evidence regarding the conditions of Ivy's environment.

The record shows that, prior to removal, Ivy's living conditions were unstable, and she had not been enrolled in school for more than a year. Mother and Ivy lived with Mother's father for a time, and Mother had an altercation with her father that resulted in her arrest for assault against a family member. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) (holding that "abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the [child's] physical or emotional well-being"). Mother engaged in other criminal behavior, resulting in her pleading guilty to criminal trespass and serving time in jail during the pendency of the case, resulting in further instability in her living arrangements.

Mother lived in various motels with Ivy, failing to supervise Ivy and her younger brother on several occasions. This included one incident in which Mother left Ivy and her brother with a woman mother did not know very well, and Ivy's brother burned down a motel. Ivy came into DFPS's care after law enforcement raided a group of hotel rooms and found Ivy alone with her brother, while Mother was sleeping in a different hotel room. The room where Mother was found also had

12

illegal drugs and guns. Mother stated at the time of this incident that she could not pay for the hotel room. A friend of her boyfriend had paid for it, but she and her children would be moving soon to another location. Both the DFPS caseworker and Court Appointed Special Advocates volunteer reported difficulty in contacting Mother.

While the case was pending, Mother was incarcerated from June 2021 until late August or early September 2021. Mother also continued to use drugs. She admitted that she used methamphetamines at the time Ivy was removed and again in November 2021, a couple of months after she got out of jail. *See id.* (holding that parent's illegal drug use and drug-related criminal activity support conclusion that child's surroundings endanger her physical or emotional well-being); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 705 (Tex. App.— Austin 2019, pet. denied) (holding that factfinder "is entitled to give 'great weight' to a parent's drug-related conduct, as it is considered a 'significant factor' supporting termination.").

The trial court, acting as the factfinder, could have reasonably concluded that Mother's failure to supervise Ivy during the hotel incident exposed her to a dangerous environment that jeopardized her physical well-being. This evidence, considered alone or coupled with the unstable home environment created by Mother's drug use and criminal acts, was legally and factually sufficient to support

the trial court's finding under subsection (D). *See* TEX. FAM. CODE § 161.001(b)(1)(D); *see A.C.*, 560 S.W.3d at 630–31 (stating standard of review for legal and factual sufficiency); *see also In re D.J.H.*, 381 S.W.3d 606, 613–14 (Tex. App.—San Antonio 2012, no pet.) (affirming factual sufficiency of finding under subsection (D) based on single dangerous incident combined with parent's "pattern of criminal activity [that] subjected him to the possibility of incarceration").

And the same evidence also demonstrated a course of endangering conduct. Mother's failure to supervise Ivy, her drug use and criminal behavior, and her corresponding instability were legally and factually sufficient to allow a reasonable factfinder to conclude that her course of conduct jeopardized Ivy's physical and emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E); *In re A.C.*, 560 S.W.3d at 630–31.

Mother argues that there was no clear and convincing evidence that she engaged in an endangering course of conduct that would support findings under subsection (E). She asserts that the evidence indicated that she had left Ivy alone only for approximately 45 minutes while Mother was in another room down the hall. During that period, however, police raided the hotel rooms and found Ivy and her brother were staying alone. Mother was found sleeping in another room. And this was not the first time the children had been found without appropriate supervision.

14

Mother also argues that DFPS did not admit copies of drug test results. Lewis's testimony relating details of three positive drug test results is some evidence of positive drug tests. Mother did not object to Lewis's testimony regarding the positive drug test results. Mother herself admitted that she used methamphetamine the night of the hotel incident that resulted in Ivy's removal from her care. She also admitted using drugs in November 2021, while this case was pending and just months after she was released from jail. Official copies of her drug test results are not required to prove her use of illegal drugs or the effect on her ability to parent. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."). Furthermore, continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under subsection (E). *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied). "And where the record contains evidence that a parent engages in drug use during the pendency of a termination suit, when he knows he is at risk of losing his children," such evidence has been found legally sufficient to support a finding of endangerment under subsection (E). *Id.*

Mother also argues that her criminal history should not be considered, because her family assault and burglary charges were dismissed, and her second

15

burglary charge was reduced to misdemeanor criminal trespass. However, as Mother's own testimony indicated, the trespass offense resulted in Mother being jailed from June 2021 until later August or early September 2021. This criminal activity and its resulting jail time, in addition to her drug use, her failure to adequately supervise Ivy, and her failure to keep Ivy enrolled in school, is evidence of conduct that would subject Ivy to instability. *See In re M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (holding that "[c]onduct that subjects a child to life of uncertainty and instability endangers the child's physical and emotional well-being," and stating that such conduct includes drug use, violence, and criminal conduct); *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (stating that while imprisonment, standing alone, is insufficient to constitute endangering course of conduct, it is factor to be considered on issue of endangerment). The evidence also indicated that Mother missed multiple visits with Ivy, and only some of those missed visitations were due to her imprisonment.

Given this evidence, we hold that the trial court could have reasonably concluded that Mother engaged in an endangering course of conduct and is legally and factually sufficient to support the trial court's finding under subsection (E). *See* TEX. FAM. CODE § 161.001(b)(1)(E); *In re A.C.*, 560 S.W.3d at 630–31 (stating standard of review for legal and factual sufficiency).

16

We overrule Mother's first and second issues.

Because we have concluded that the evidence was sufficient to support the trial court's endangerment findings pursuant to subsections (D) and (E), we need not address the other grounds for termination pursuant to subsections (N) and (O). *See In re N.G.*, 577 S.W.3d 230, 231, 236–37 (Tex. 2019) (per curiam) (holding that "[t]o affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding— even if the trial court based the termination on more than one ground"; explaining that due process and due course of law considerations require appellate court to review sufficiency of evidence supporting (D) or (E) grounds "when the parent has presented the issue to the court" because endangerment findings in prior termination proceedings can be used as basis for termination in subsequent proceedings involving other children).

### Best Interest

In her fifth issue, Mother argues that the evidence was insufficient to support the trial court's finding that terminating her parental rights to Ivy was in the child's best interest.

The Texas Legislature has set out several factors that courts should consider in determining whether a child's parent is willing and able to provide the child with a safe environment, including: (1) the child's age and physical and mental

vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude and frequency of harm to the child; (4) whether the child has been the victim of repeated harm after the initial intervention by DFPS; (5) whether there is a history of abusive or assaultive conduct or substance abuse by the child's family or others who have access to the child's home; (6) the willingness of the child's family to seek out, accept, and complete counseling services; (7) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and (8) whether the child's family demonstrates adequate parenting skills, including providing minimally adequate care for the child's health and nutritional needs, care consistent with the child's physical and psychological development, guidance and supervision consistent with the child's safety, a safe physical home environment, and an understanding of the child's needs and capabilities. TEX. FAM. CODE § 263.307(b).

The Supreme Court of Texas has also set out several non-exclusive factors that we should consider when determining whether the termination of a parent's rights is in the child's best interest, including (1) the child's desires; (2) the child's current and future physical and emotional needs; (3) the current and future physical danger to the child; (4) the parental abilities of the person seeking custody; (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child; (6) the plans for the child by the person

18

seeking custody; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not proper; and (9) any excuse for acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re A.C.*, 394 S.W.3d 633, 641–42 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

These factors are not exhaustive, and it is not necessary that DFPS prove all these factors "as a condition precedent to parental termination." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in the children's best interest. *In re A.C.*, 394 S.W.3d at 642.

The best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*; *see In re C.H.*, 89 S.W.3d at 28 (stating that past performance as parent "could certainly have a bearing on [parent's] fitness to provide for" child, and courts should consider prior history of child neglect in best-interest analysis).

The evidence of endangerment outlined above, including Mother's drug use, imprisonment, failure to adequately supervise Ivy, and other instability that

resulted in Ivy not being enrolled in school, supports the trial court's best-interest finding. *See In re C.H.*, 89 S.W.3d at 27–28 (holding that evidence establishing predicate grounds under section 161.001(b)(1) also may be relevant to determining child's best interest); *see also* TEX. FAM. CODE § 263.307(b) (best-interest factors include considerations such as frequency and severity of harm to child, parent's history of violent behavior, drug use, or criminal activity, among others).

The evidence also demonstrated that Mother did not make any significant efforts to complete her family plan of service. *See* TEX. FAM. CODE § 263.307(b) (best-interest factors include parent's willingness to seek out services and demonstrate ability to provide adequate parenting skills). Mother testified at trial that she had income and stable housing, but she did not provide any pay stubs or other evidence to support her testimony. Nothing in the record supported Mother's conclusory testimony that she could provide a safe and appropriate home for Ivy.

Regarding Ivy's current placement, the evidence indicated that her foster family wanted to adopt her, and Ivy was bonded with them. When Ivy was briefly removed from her foster home to be placed with a family member, the foster family continued to visit with Ivy. When the family member died, the foster family made a smooth transition for Ivy to return to their home. The foster family enrolled Ivy in school and worked with her to catch up on her missed schooling. This evidence further demonstrates that termination of Mother's parental rights was in

20

Ivy's best interest. *See* TEX. FAM. CODE § 263.307(b); *Holley*, 544 S.W.2d at 372 (holding that future plans for child are relevant to best-interest determination).

Mother argues that the evidence is legally and factually insufficient. Regarding the first *Holley* factor—Ivy's desires—Mother contends that there was no evidence of Ivy's wishes even though she was old enough to make her desires known. We observe, however, that the absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in the child's best interest. *In re A.C.*, 394 S.W.3d at 642. Furthermore, "[e]vidence that a child is well-cared for by a foster family or a proposed adoptive placement, is bonded to the proposed placement, and has spent minimal time in the presence of the child's parent is relevant to the best interest determination and, specifically, is relevant to the child's desires." *In re M.D.M.*, 579 S.W.3d at 770.

Mother further argues that there was no evidence of factors such as current or future danger to Ivy, Mother's parental abilities, or programs available to help Mother. These arguments do not account for the fact that the trial court could consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence in making its best-interest finding. *See In re B.R.*, 456 S.W.3d at 616. Although no witness testified explicitly about the physical danger to Ivy, the evidence of Mother's past negligence and current drug

21

use and criminal activities allowed the trial court to make inferences regarding Ivy's safety and well-being while in Mother's care. Lewis did not testify regarding Mother's parental abilities or programs that might help her, but Lewis did state that DFPS gave Mother a family plan of service and that Mother completed no services. Mother argues that she completed a substance abuse assessment, but she also acknowledges that she did not complete any of the follow-up recommendations. Lewis testified that she did not receive any documentation to support Mother's testimony that she completed the substance abuse assessment or obtained employment and stable housing.

We therefore conclude—considering the evidence in the light most favorable to the trial court's finding and considering all of the evidence, including disputed and conflicting evidence—that a factfinder could have reasonably formed a firm belief or conviction that termination of Mother's parental rights to Ivy was in the child's best interest. *See* TEX. FAM. CODE § 161.001(b)(2); *In re E.N.C.*, 384 S.W.3d at 802; *In re H.R.M.*, 209 S.W.3d 105,108 (Tex. 2006). We hold that the evidence was legally and factually sufficient to support the trial court's best-interest finding.

We overrule Mother's fifth issue.

## Conclusion

We affirm the trial court's final decree terminating Mother's parental rights to Ivy.

Richard Hightower
Justice

Panel consists of Chief Justice Radack and Justices Landau and Hightower.